IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED

SEP 16 2021

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **S U P E R S E D I N G** |
| | ) **I N D I C T M E N T** |
| Plaintiff, | ) |
| | ) JUDGE J. PHILIP CALABRESE |
| | ) |
| v. | ) |
| | ) CASE NO. 1:21CR491 |
| PAUL SPIVAK, | ) |
| OLGA SMIRNOVA, | ) Title 15, United States Code, |
| CHARLES SCOTT, | ) Sections 78j(b) and 78ff; Title |
| FORREST CHURCH, | ) 18, United States Code, Sections |
| RICHARD MALLION, | ) 371, 1343, and 2; Title 17, Code |
| JASON ARTHUR, | ) of Federal Regulations, Section |
| LARRY MATYAS, | ) 240.10b-5 |
| DONALD HOWARD, | ) |
| | ) |
| Defendants. | ) |

<u>GENERAL ALLEGATIONS</u>

At all times material to this Indictment:

## I.     **Defendants**

1.     Defendant PAUL SPIVAK was a resident of Willoughby Hills, Ohio, in the

Northern District of Ohio, Eastern Division.

2.     Defendant OLGA SMIRNOVA was a resident of Willoughby Hills, Ohio, in the

Northern District of Ohio, Eastern Division.

3.     Defendant CHARLES SCOTT was a resident of Alexandria, Virginia.

4.     Defendant FORREST CHURCH was a resident of Haleyville, Alabama.

5.     Defendant RICHARD MALLION was a resident of Davie, Florida.  MALLION

also used the alias "RICHARD BURNSTEIN."

6.      Defendant JASON ARTHUR was a resident of Henderson, Nevada.  ARTHUR also used the alias "JIM GATES."

7.      Defendant LARRY MATYAS was a resident of Las Vegas, Nevada.

8.      Defendant DONALD HOWARD was a resident of Las Vegas, Nevada.

## II.      Relevant Entities, and Bank Accounts

9.      OTC Markets, Inc. ("OTC Markets") was an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers.  Companies trading on OTC Markets tended to be very small, and the stock tended to be closely held (i.e., owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

10.     US Lighting Group, Inc., ("USLG"), was a publicly traded Florida corporation, and was registered on or about October 17, 2003, with its principal place of business in Euclid, Ohio.  SPIVAK was the Chief Executive Officer ("CEO") of USLG.  USLG's purported business operations were focused on the design and manufacturing of commercial LED lights, aftermarket automotive parts, and the design and manufacturing of fiberglass recreational campers and boats.  US LIGHTING GROUP, INC. traded on OTC Markets under the ticker USLG.

11.     The following table lists entities relevant to this Indictment, their approximate dates of registration, the State of registration, any listed agents or officers of an entity, and the defendant or co-conspirator in actual control of the entity:

| Entity | Approx. Date of Registration | State of Registration | Officer/Agents of Entity | *De Facto* Control of Entity |
|---|---|---|---|---|
| FJC Investment Solutions LLC ("FJC Investment") | May 16, 2019 | Alabama | CHURCH – Registered Agent | CHURCH |

| Entity | Approx. Date of Registration | State of Registration | Officer/Agents of Entity | *De Facto* Control of Entity |
|---|---|---|---|---|
| HSF Investments Inc. ("HSF Investments") | Jun. 20, 2005 | Florida | Nominee-1 – Registered Agent | MALLION |
| HSF Investment Services, Inc. ("HSF Investment Services") | Apr. 27, 2015 | Florida | Nominee-1 – Registered Agent | MALLION |
| Legacy Global Investments, Inc. ("Legacy Global") | Jan. 25, 2017 | Florida | MALLION – Registered Agent, President, Treasurer, Secretary and Director | MALLION |
| South Beach Supplements, Inc. ("South Beach") | Sep. 19, 2016 | Florida | MALLION – Registered Agent | MALLION |
| HDG Global Marketing, LLC ("HDG Global") | Oct. 11, 2018 | California | Individual 2 and Individual 3 – Members and Managers | N/A |
| Fast Casual Ad LLC ("Fast Casual") | Feb. 10, 2016 | Nevada | Co-Conspirator 4 – Owner | Co-Conspirator 4 |
| North Star Assets LLC ("North Star") | Nov. 18, 2016 | Wyoming | Co-Conspirator 4 – Manager | Co-Conspirator 4 |
| A&M Lead Consulting LLC ("A&M Lead") | Sep. 28, 2015 | Nevada | ARTHUR – Manager | ARTHUR |
| U.S. Lead Generation LLC ("U.S. Lead") | Nov. 7, 2016 | Nevada | ARTHUR – Owner and Manager | ARTHUR |

12.     The following table lists bank and brokerage accounts established in the names of

the relevant entities, which were used to facilitate the schemes outlined below:

| Entity/Person on the Account | Approx. Date Opened | Financial Institution / Brokerage | Last 4 of Account | Authorized Signer(s) | *De facto* control person |
|---|---|---|---|---|---|
| USLG | July 1, 2014 | Huntington National Bank | x5187 | SPIVAK Co-Conspirator 2 | SPIVAK |
| FJC Investment | May 21, 2019 | Wilson-Davis & Co. | x5008 | CHURCH | CHURCH |
| FJC Investment | Jul. 10, 2019 | Bank of America | x8729 | CHURCH | CHURCH |

| Entity/Person on the Account | Approx. Date Opened | Financial Institution / Brokerage | Last 4 of Account | Authorized Signer(s) | *De facto* control person |
|---|---|---|---|---|---|
| **Individual-1 d/b/a Secured Consulting** | Aug. 28, 2018 | Wells Fargo | x8427 | Individual-1 | MATYAS |
| HSF Investment | May 7, 2008 | Wilson-Davis & Co. | x6750 | Nominee-1 | MALLION |
| HSF Investment | June 29, 2008 | Alpine Securities | x7010 | Nominee-1 | MALLION |
| HSF Investment Services | Dec. 9, 2015 | SunTrust/Truist | x1063 | Nominee-1 | MALLION |
| Legacy Global | Jan. 21, 2017 | Bank of America | x2314 | MALLION | MALLION |
| Legacy Global | Apr. 4, 2018 | Citibank | X7432 | MALLION | MALLION |
| South Beach | Sep. 20, 2016 | SunTrust Bank | x8694 | MALLION | MALLION |
| HDG Global | Nov. 8, 2018 | Wells Fargo | x3016 | Individual 2 Individual 3 | N/A |
| Fast Casual | Feb. 11, 2016 | Wells Fargo | x7481 | Co-Conspirator 4 | Co-Conspirator 4 |
| North Star | Nov. 18, 2016 | Bank of America | x9235 | Co-Conspirator 4 | Co-Conspirator 4 |
| A&M Lead | Feb. 4, 2016 | Wells Fargo | x5274 | ARTHUR | ARTHUR |
| U.S. Lead | Dec. 5, 2016 | Wells Fargo | x4469 | ARTHUR | ARTHUR |

13.     The following table lists bank and brokerage accounts established in the names of

individuals, which were used to facilitate the schemes outlined below:

| Entity/Person on the Account | Approx. Date Opened | Financial Institution / Brokerage | Last 4 of Account |
|---|---|---|---|
| CHURCH and Spouse | Jan. 15, 2013 | TD Ameritrade | x5433 |
| CHURCH | Oct. 26, 2016 | Merrill Lynch | x7D77 |
| CHURCH and Spouse | Aug. 29, 2017 | Merrill Lynch | x2431 |
| CHURCH | Oct. 27, 2017 | Tradestation Securities | x4807 |
| CHURCH and Spouse | Jan. 12, 2018 | Bank of America | x2853 |
| CHURCH | Jun. 27, 2018 | Fidelity Investments | x5331 |
| CHURCH | Nov. 6, 2018 | Wilson-Davis & Co. | x4452 |
| MATYAS | Mar. 7, 2018 | Wells Fargo | x1867 |
| Individual 2 and Individual 3 | Jan 15, 2015 | Wells Fargo | x6769 |
| SCOTT | Apr. 6, 2007 | Navy Federal Credit Union | x8616 |
| SCOTT | Apr. 10, 2018 | Merrill Lynch | x7409 |

### III.    Roles in the Scheme

14.    SPIVAK controlled a substantial number of outstanding, restricted, and free-trading shares of USLG through his personal holdings, family members, co-conspirators, and associates over which he had influence and control.  SPIVAK was CEO of USLG and used co-conspirators and nominees to acquire outstanding shares.  SPIVAK paid kickbacks to unlicensed stockbrokers for soliciting and selling shares of USLG to investors.

15.    SMIRNOVA was the former Vice President of Finance of USLG and assisted SPIVAK in executing the fraudulent scheme.  SMIRNOVA participated in meetings with SPIVAK and other co-conspirators where the fraudulent scheme was discussed. SMIRNOVA assisted in the payment of fraudulent kickbacks to unregistered brokers for soliciting investors.  By virtue of SMIRNOVA's relationship to SPIVAK, SMIRNOVA benefitted personally from the fraud.

16.    SCOTT controlled a substantial number of outstanding, restricted, and free-trading shares of USLG.  SCOTT had a profit-sharing arrangement with SPIVAK from the proceeds of stock sales.

17.    CHURCH controlled a substantial number of outstanding, restricted, and free-trading shares of USLG.  CHURCH placed manipulative trades in USLG intended to stabilize or increase the share price or trading volume in USLG.  CHURCH had a profit-sharing arrangement with SPIVAK from the proceeds of stock sales.

18.    MALLION controlled a substantial number of outstanding, restricted, and free-trading shares of USLG through his personal companies, co-conspirators, family members, and associates over which he had influence and control.  MALLION used co-conspirators and nominees to acquire outstanding shares.  MALLION worked as an unlicensed stockbroker and solicited potential investors to purchase shares of USLG.

19.     ARTHUR worked as an unlicensed stockbroker and solicited potential investors to purchase shares of USLG.  ARTHUR received kickbacks or undisclosed commissions for the sale of shares of USLG to investors.  ARTHUR also received and paid kickbacks to other unlicensed stockbrokers for soliciting and selling shares of GBEN to investors.

20.     MATYAS worked as an unlicensed stockbroker and solicited potential investors to purchase shares of USLG.  MATYAS received kickbacks or undisclosed commissions for the sale of shares of USLG to investors

21.     HOWARD worked as an unlicensed stockbroker and solicited potential investors to purchase shares of USLG.  HOWARD received kickbacks or undisclosed commissions for the sale of shares of USLG to investors.

A.  Co-Conspirators

22.     Co-Conspirator 1 worked as an Office Manager and Bookkeeper for USLG.  Co-Conspirator 1 managed the financial records, tracked investor lists, issued stock certificates, and tracked undisclosed commissions or kickbacks back to unregistered stockbrokers.

23.     Co-Conspirator 2 worked as the former Chief Financial Officer of USLG.

24.     Co-Conspirator 3 worked as an unlicensed stockbroker and solicited potential investors to purchase shares in USLG.  Co-Conspirator 3 received kickbacks or undisclosed commissions for the sale of shares of USLG to investors.

25.     Co-Conspirator 4 worked as an unlicensed stockbroker and solicited potential investors to purchase shares in USLG.  Co-Conspirator 3 received kickbacks or undisclosed commissions for the sale of shares of USLG to investors.

### B. Promoters

26.     The Defendants and others used promoters to solicit potential investors to purchase their shares in USLG.  The promotions typically coincided with favorable press releases or other information that the Defendants caused to be released.

27.     Promotional Company 1, Promotional Company 2, and Promotional Company 3 operated call rooms which solicited investors and potential investors to purchase shares of USLG in the open market to increase the share price and trading volume in USLG.

### C. Attorneys

28.     The Defendants and others provided attorneys with fraudulent information to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, et al., often referred to as Rule 144.  These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations.  The Defendants and others provided these Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions.

## IV.     The SEC, Securities Regulations, Relevant Regulatory Principles, and Definitions

29.     The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the United States-based stock exchanges.  USLG's shares were registered with the SEC.

30.     Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the SEC in publicly available filings; (b) brokerage

7

firms and transfer agents involved in the purchase and sale of stock in the companies subject to SEC regulations; and (c) the public. Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

31.     Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 made it illegal for anyone to, among other things, employ any scheme to defraud, make an untrue statement or omission of material fact, or engage in any act, practice, or course of business, in connection with the purchase or sale of any security—regardless of whether the registered public company was registered under Section 12 of the Securities Act or required to file reports under Section 15(d) of the Securities Act or "unregistered."

32.     Failure to disclose to investors the commission payments from third parties, including payments from issuers, was considered an omission of a material fact as part of a securities transaction under federal securities law.

33.     "Kickbacks" were paid to co-conspirators in a variety of ways, including but not limited to, undisclosed commissions for selling shares, retainage of illicit proceeds, and heavily discounted blocks of shares so the co-conspirator could also profit from the manipulated stock.

34.     The term "issuer" in the Securities Act included any person directly or indirectly controlling or controlled by, or any person under direct or indirect common control with, the issuer.

35.     "Microcap" or "penny" stocks were stocks of publicly traded U.S. companies with a low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a

small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

36.     Convertible debt was a form of short-term debt that could be converted into equity.  Small publicly traded companies typically needed money for expenses or capital they normally could not afford.  Issuing convertible debt in the form of notes gave the company instant cash flow for expenses and the lender or future shareholder received the right to convert the note into equity in the company.  There were restrictions and guidelines set forth by regulating bodies such as the SEC, however, that required certain disclosures associated with these transactions.

A.     Pump and Dump

37.     Market manipulation schemes known as "pump and dump" schemes typically involved creating a price for a security that was not reflective of true market value, thereby allowing individuals holding large blocks of the inflated stock to sell shares they obtained for little or no money at the inflated price.  The purchasing party was left with a near-worthless security when the price dropped to accurately reflect the stock's true value, or lack thereof, in the market.  There were generally three phases to a pump and dump scheme: (i) obtaining and concealing control of a significant portion of a publicly traded company's stock, (ii) fraudulently inflating or keeping inflated the price and trading volume of the company's stock through a variety of means, including controlling the release of favorable news, directing and coordinating with promoters and co-conspirators by providing press releases and other materials in advance of its release to the public, and obfuscating the parties paying for the promotion; and (iii) after the price of the stock was fraudulently inflated, selling the stock using the fraudulently inflated price as a benchmark, thereby profiting at the expense of the investing public.

B.    Rule 144

38.    Federal statutes and regulations generally prohibited a company or its affiliates from selling shares of stock to the investing public unless the company made public disclosures about its ownership, management, finances, and operations.  Such disclosures usually were made by filing a registration statement with the SEC for a particular stock distribution.

39.    A distribution of stock pursuant to Rule 144 under the Securities Act of 1933 was an exemption to the registration requirement.  If a person was not an affiliate of the company or its management, and had cleared various technical hurdles, that person could legally sell the stock under Rule 144.  In contrast, an affiliate, defined as a person who "directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control" with those who manage the company, was subject to additional restrictions.  Relevant to Rule 144, affiliates could sell shares to the public only if they meet several requirements, including (1) filing disclosures with the SEC (on SEC Form 144) regarding the sales, and (2) staying within strict share volume limitations.  The volume limitations restricted a person's sales under Rule 144 during any three-month period to (a) 1% of the total number of outstanding shares, or (b) the average weekly trading volume for the preceding four weeks, whichever was greater.

40.    In such schemes, an individual who was a known affiliate of a microcap company (the "Insider," e.g., the company's CEO, CFO, or member of its board of directors) entered into a secret agreement with another individual who had access to a brokerage account (the "Seller").  Under such an agreement, the Insider transferred or issued stock (or a security that can be converted into stock) to the Seller.  The Seller then attempted to deposit the stock at his or her brokerage firm.  Under applicable securities regulations, brokerage firms had a duty of reasonable inquiry to determine whether a client's (the Seller's) offering of stock to the public was registered with the SEC or whether an exemption applied.

41.     If the Seller was successful in convincing the brokerage firm that an exemption from the registration requirement applied, the Seller sold the stock to the public, and kicked back a portion of the proceeds to the Insider.  This secret agreement, if known, would support a finding that the Seller was an "affiliate," and therefore could only sell a limited quantity of shares to the public.  The affiliate and the Insider therefore often misrepresented the facts surrounding the arrangement to, and hide the secret agreement from, the Seller's brokerage firm.

### THE SCHEME TO DEFRAUD

42.     From in or around 2016, through in or around 2021, PAUL SPIVAK, OLGA SMIRNOVA, CHARLES SCOTT, FORREST CHURCH, RICHARD MALLION, JASON ARTHUR, LARRY MATYAS, DONALD HOWARD and others, known and unknown to the Grand Jury, knowingly and intentionally conspired to commit an offense against the United States, that is, Securities Fraud, by conspiring and agreeing to defraud investors and potential investors in USLG by: (a) concealing Defendant's ownership or control interests in freely-trading stock held in the names of co-conspirators; (b) arranging to fraudulently engineer price movements and trading volume in the USLG stock using paid promoters; and (c) paying kickbacks and undisclosed commissions to co-conspirators who sold stock in their names and sent proceeds back to USLG to purchase more stock to continue the fraudulent scheme.

**I.      The Pump: Inflation of the Fraudulent USLG Stock**

43.     SPIVAK and MALLION, in control of USLG, together with others known and unknown to the Grand Jury, devised and intended to devise a scheme whereby SPIVAK and MALLION fraudulently inflated USLG's share price and trading volume and then orchestrated the sale and purchase of USLG stock at a profit.

44.     SPIVAK, MALLION, and others, sought to manipulate the USLG shares by gaining control of significant amounts of the stock and controlling the trading volume of USLG,

and by coordinating the sale of large blocks of shares timed with the issuance of press releases by the company.

45.     SPIVAK, and others, used nominees and co-conspirators to conceal SPIVAK's beneficial ownership of free-trading USLG shares by representing the nominees and co-conspirators were "non-affiliates" of USLG.

46.     During the periods when USLG's stock was being promoted and manipulated, the value of the stocks did not reflect to their actual current and future earnings potential or business operations. SPIVAK and others used the inflated share price to sell restricted stock at a discount while concealing the payment of fraudulent kickbacks to co-conspirators from the investors who purchased the restricted stock.

## II.     The Dump: Profits at Investors' Expenses

47.     SPIVAK, and others known and unknown to the Grand Jury, obtained millions of shares in USLG at little or no cost and then profited by selling USLG to the public market at fraudulent and artificially inflated prices without disclosing that he controlled the shares being sold into the market.  SPIVAK, and others, used the proceeds of the sales to enrich themselves, to fund additional fraudulent stock schemes, and raise capital for USLG.

COUNT 1
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371)

The Grand Jury charges:

48.     The allegations contained in paragraphs 1 through 47 are re-alleged and incorporated as though fully set forth herein.

49.     From in or around 2016, through in or around 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL SPIVAK, OLGA SMIRNOVA, FORREST CHURCH, CHARLES SCOTT, RICHARD MALLION, JASON ARTHUR,

LARRY MATYAS, and DONALD HOWARD, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit offenses against the United States, to wit:

a.     To knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made false statements of material fact and omitting material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of US Lighting Group, Inc. ("USLG") securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud).

## OBJECTS OF THE CONSPIRACY

50.     The objects of the conspiracy included but were not limited to: (1) defrauding investors; (2) obtaining investor monies and paying and receiving undisclosed commissions; (3) inflating the value of USLG; and (4) enriching the conspirators.

MANNER AND MEANS

51.    It was part of the conspiracy that:

a.    SPIVAK, MALLION, SCOTT, and others obtained control of a public "shell" company and executed the acquisition or merger of businesses with the shell to create a publicly traded company.

b.    MALLION, ARTHUR, MATYAS, HOWARD, and others solicited the investing public to purchase restricted and free trading shares of USLG.

c.    SPIVAK, MALLION, CHURCH, and others artificially inflated the shares of price USLG, to make the restricted stock investments more attractive to sell to the investing public.

d.    SPIVAK, SMIRNOVA, and others utilized fraudulent consulting agreements and invoices to conceal illegal kickbacks paid to unregistered brokers.

e.    ARTHUR, MALLION, MATYAS, HOWARD, and others provided fraudulent invoices to receive payment of illegal kickbacks from soliciting investors.

f.    ARTHUR, MALLION, MATYAS, HOWARD, and others made material misrepresentations to investors including statements regarding the company, the structure of the restrict stock investment, the timing of the restricted hold period, and the use of the proceeds of the investment.

g.    SPIVAK, MALLION, SCOTT, CHURCH, and others sold free trading shares into the market or had others sell shares on their behalf while concealing that they, in fact, controlled the shares of USLG.

14

h.      MALLION, CHURCH, and others used manipulative stock trading techniques, such as match trades, and "painting the tape" to artificially inflate the share price of USLG.

i.      SPIVAK, MALLION, SCOTT, CHURCH, and others, either directly or through others they controlled, sought out and provided false, incomplete, and fraudulent information to attorneys to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing the stock for sale.

j.      SPIVAK, SMIRNOVA, and others, arranged to pay undisclosed commissions and kickbacks to co-conspirators who helped facilitate the sale USLG shares.

k.      SPIVAK, MALLION, and others, arranged for the shares they controlled to be held in the names of co-conspirators or nominees to avoid restrictions on their ability to sell the shares in the market.

l.      SPIVAK, and others, arranged to artificially inflate the price of USLG shares by creating and releasing favorable press releases, which were timed with planned promotions to inflate USLG.

m.      SPIVAK, MALLION, and others, paid stock promoters and media companies to promote USLG to the investing public.

n.      SPIVAK, MALLION, SCOTT, CHURCH, ARTHUR, MATYAS, HOWARD, and others, divided up the proceeds from the sale of restricted and free trading shares of the USLG in accordance with their respective interests or commission in shares sold.

OVERT ACTS

52.     In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed the following overt acts, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

a.      On or about June 28, 2016, SPIVAK caused the purchase of 23,275,000 shares of The Luxurious Travel Corp ("LXRT"), the predecessor to USLG.

b.      On or about June 28, 2016, SCOTT caused the purchase of 1,225,000 shares of LXRT.

c.      On or about July 19, 2016, ARTHUR caused Victim-1 to wire transfer $25,000 to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

d.      On or about July 20, 2016, SPIVAK caused the wire transfer of $7,200 to ARTHUR controlled A&M Lead bank account x5274 at Wells Fargo for payment of an undisclosed commission.

e.      On or about July 21, 2016, SPIVAK caused the wire transfer of $5,300 to ARTHUR controlled A&M Lead bank account x5274 at Wells Fargo for payment of an undisclosed commission.

f.      On or about July 26, 2016, SPIVAK caused the wire transfer for $12,500 from USLG bank account x5187 at Huntington Bank to MALLION controlled HSF Investment Services account x1063 at SunTrust.

g.      On or about July 27, 2016, MALLION caused the issuance of a $12,500 check from HSF Investment Services account x1063 at SunTrust Bank to Empire Global Advisory for the purchase of 750,000 free-trading shares of USLG.

h.      On or about August 5, 2016, MALLION caused the purchase of 750,000 free-trading shares of LXRT.

i.      On or about August 5, 2016, MALLION caused an email to be sent utilizing the email address, richard@uslightinggroup.com, to the transfer agent containing an "Transfer Instruction Form," which listed MALLION's telephone number for HSF Investment Services. Both the Transfer Instruction Form and email were signed by Nominee 1.

j.      On or about August 26, 2018, MALLION caused the deposit of a $10,000 check into HSF Investment Services account x1063 at SunTrust Bank for the sale of USLG shares to Victim-2.

k.      On or about August 26, 2018, MALLION caused a wire transfer of $10,000 into HSF Investment Services account x1063 at SunTrust Bank for the sale of USLG shares to Victim-3.

l.      On or about August 26, 2016, MALLION caused the wire transfer of $10,000 from HSF Investment Services account x1063 at SunTrust Bank to SPIVAK controlled USLG account x5187 at Huntington Bank.

m.      On or about September 2, 2016, MALLION caused the wire transfer of $5,000 from HSF Investment Services account x1063 at SunTrust Bank to SPIVAK controlled USLG account x5187 at Huntington Bank.

n.      On or about September 8, 2016, MALLION caused the purchase of 750,000 free-trading shares of USLG.

o.      On or about September 8, 2016, SPIVAK and MALLION exchanged a series of

text messages with SPIVAK, MALLION, SMIRNOVA, and Co-Conspirator 1 regarding

the sale of USLG stock:

> SPIVAK: "When the hell r u sending money?"
>
> MALLION: "Gave dale money from legal fees paying transfer agent"
>
> MALLION: "Was waiting on two investors to send money into escrow"
>
> MALLION: "And stock to clear"
>
> SPIVAK: "Well there ain't gonna be no mother ship !!!"
>
> MALLION: "F**k"
>
> SPIVAK: "We just all believe ur not capable of doing what you promised . And
>
> we're thinking of selling the shell…
>
> MALLION: "I said free trading not private"

p.      Later on the same date, SPIVAK and MALLION exchanged a series of text

messages with SPIVAK, MALLION, SMIRNOVA, and Co-Conspirator 1 regarding the

sale of USLG:

> SPIVAK: "Richard, you gave only sent us 15k in the months we have been doing
>
> this, but this stupid audit has cost us far more in man power.  You taking the day
>
> off is not different than when you are supposedly working…"
>
> MALLION: "Haven't even started yet and everyone wants to quit"
>
> MALLION: "Iam trying to set up for trading"
>
> SPIVAK: "15k"

q.      Later on the same date, SPIVAK and MALLION exchanged a series of text messages with SPIVAK, MALLION, SMIRNOVA, and Co-Conspirator 1 regarding the sale of USLG:

>       SPIVAK: "This is exactly what Olga said was going to happen !!!!"
>
>       SPIVAK: "Everyone was getting money but the company"
>
>       MALLION: "What ! This is crazy"
>
>       SPIVAK: "The deal is done !!!!"
>
>       MALLION: "Ok"
>
>       MALLION: "Haven't even gotten the free trading yet o well"
>
>       SPIVAK: "No money tmoro u can lose our number!!!"
>
>       MALLION: "Really wow !"
>
>       MALLION: "Actually not doing this every week"
>
>       MALLION: "I stopped selling private two weeks ago"
>
>       SPIVAK: "Well you only sent us 15k total! Jason stopped caused you stole his leads !  Now I'm stuck with all the overhead!!!"
>
>       MALLION: "Really like the 60000 thousand from Shane two weeks after he sent to escrow Jim gates sent him a purchase order for 60000 at 25 cents free trading"
>
>       SPIVAK: "Well you just don't understand"
>
>       MALLION: "Wants to know when he's getting his freetrading and he got restricted at .50 cents"

r.      On or about September 9, 2016, SPIVAK sent a text message to MALLION, SMIRNOVA, and Co-Conspirator 1 regarding the sale of USLG stock:

>       SPIVAK: "Just call [Co-Conspirator 1] already. We can't make payroll"

s.      On or about September 9, 2016, MALLION exchanged a series of text messages

with Co-Conspirator 1 regarding the MALLION sending money to USLG:

> MALLION: "Iam borrowing money"
>
> MALLION: "Will five due"
>
> MALLION: "Hello"
>
> Co-Conspirator 1: "No we need $15k"
>
> MALLION: "Wow! Companies in trouble I stopped raising money two weeks
>
> ago to prepare for the marketing of the stock"
>
> Co-Conspirator 1: "I'm not sure why you would stop raising money or why you
>
> needed to get the additional 750k free-trading shares yesterday"

t.      On or about September 9, 2016, MALLION caused the wire transfer of $7,500

from HSF Investment Services account x1063 at SunTrust Bank to SPIVAK controlled

USLG account x5187 at Huntington Bank.

u.      On or about September 14, 2016, ARTHUR caused Victim-4 to send a check for

$5,000 to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

v.      On or about September 16, 2016, SPIVAK caused the wire transfer of $5,000 to

ARTHUR controlled A&M Lead bank account x5274 at Wells Fargo for payment of an

undisclosed commission.

w.      On or about September 19, 2016, SPIVAK caused the wire transfer of $5,000 to

ARTHUR controlled A&M Lead bank account x5274 at Wells Fargo for payment of an

undisclosed commission.

x.      On or about September 22, 2016, MALLION caused the deposit of 500,000

shares of USLG in HSF Investment brokerage account x7010 at Alpine Securities.

y.      On or about September 22, 2016 and September 23, 2016, SPIVAK, MALLION,

Co-Conspirator 1 and Individual 4 exchanged sent a series of text messages regarding

USLG shares:

      SPIVAK: "The stock is at $1.50 If you dump it I won';t talk to you any more !"

      Individual 4: "Well you would have to talk to me in the first place……."

      Individual 4: "$4 is my target"

      SPIVAK: "We are on the same page!!  have a good night!

      MALLION: "Let's get this going!"

z.      On or about September 29, 2016, SPIVAK and MALLION exchanged a series of

text messages with SPIVAK, MALLION, SMIRNOVA, and Co-Conspirator 1 regarding

the proceeds of USLG stock sales:

      SPIVAK: "And another day that we ain't got no money! Just sayin…

      MALLION: "Yea I know broker is wiring money today so they say"

aa.     On or about September 29, 2016, MALLION caused the wire transfer of $50,000

from HSF Investment account x7010 at Alpine Securities to HSF Investment Services

account x1063 at SunTrust Bank

bb.     On or about September 30, 2016, MALLION caused the wire transfer of $10,000

from HSF Investment Services account x1063 at SunTrust Bank to SPIVAK controlled

USLG account x5187 at Huntington Bank.

cc.     On or about October 3, 2016, MALLION caused the wire transfer of $50,000

from HSF Investment account x7010 at Alpine Securities to HSF Investment Services

account x1063 at SunTrust Bank.

dd.     On or about October 4, 2016, MALLION caused the deposit of a $134,601.60 check from HSF Investment account x7010 at Alpine Securities to HSF Investment Services account x1063 at SunTrust Bank

ee.     On or about October 4, 2016, MALLION caused the wire transfer of $5,000 from HSF Investment Services account x1063 at SunTrust Bank to SPIVAK controlled USLG account x5187 at Huntington Bank.

ff.     On or about October 13, 2016, ARTHUR and Co-Conspirator 4 caused Victim-5 to send a check for $5,000 to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

gg.     On or about October 13, 2016 Co-Conspirator 1, ARTHUR and Co-Conspirator 4, exchanged a series of text messages regarding the sale of USLG stock and accounting:

> Co-Conspirator 1: "Just received $5k from Victim-5…who do I credit?"
>
> ARTHUR: "Good deal"
>
> ARTHUR: "[Co-Conspirator 4] and I both"

hh.     On or about October 21, 2016, Co-Conspirator 4 caused Victim-6 to send a check for $50,000 to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

ii.     On or about October 24, 2016, Co-Conspirator 1 sent a text message to ARTHUR and Co-Conspirator 4 regarding undisclosed commissions:

> Co-Conspirator 1: "New procedure going forward: if I don't have complete paperwork, you don't get paid commission. It's part of the whole sales process boys!"

jj.    On or about October 24, 2016, SPIVAK, Co-Conspirator 4, and Co-Conspirator 1 caused the wire transfer of $4,500 from USLG account x5187 at Huntington Bank to Promotional Company 2 for the promotion of USLG stock.

kk.    On or about October 25, 2016, SPIVAK caused the wire transfer of $22,500 to Co-Conspirator 4 controlled Fast Casual bank account x7481 at Wells Fargo for payment of an undisclosed commission.

ll.    On or about October 26, 2016, CHURCH caused the deposit of 39,100 shares of USLG into brokerage account x7D77 at Merrill Lynch.

mm.    On or about October 28, 2016, MALLION caused the wire transfer of $4,703.64 from HSF Investment account x7010 at Alpine Securities to HSF Investment Services account x1063 at SunTrust Bank.

nn.    On or about November 3, 2016, Co-Conspirator 4 caused Victim-7 and Victim-8 to send checks for $7,000 and $25,000, respectively, to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

oo.    On or about November 8, 2016, SPIVAK, caused the wire transfer of $31,150 to Co-Conspirator 4 controlled Fast Casual bank account x7481 at Wells Fargo.

pp.    On or about November 17, 2016, Co-Conspirator 1 sent a series of text messages to SPIVAK and SMIRNOVA regarding restricted stock investments, MALLION and Co-Conspirator 3:

　　　　Co-Conspirator 1: "Received $25k Victim-8 & $50k Victim-9"

　　　　Co-Conspirator 1: "I strongly recommend we cut off Richard [MALLION] & [Co-Conspirator 3]'s uslg email"

qq.     On or about November 21, 2016, SPIVAK caused the wire transfer of $22,250 to
ARTHUR controlled A&M Lead bank account x5274 at Wells Fargo.

rr.     On or about November 21, 2016, SPIVAK caused the wire transfer of $22,750 to
Co-Conspirator 4 controlled Fast Casual bank account x7481 at Wells Fargo.

ss.     On or about December 15, 2016 SPIVAK and MALLION exchanged a series of
text messages regarding USLG share price:

> SPIVAK: "Well someone keeps selling and I keep spending way too much time
> on the phone with shareholders"
>
> SPIVAK: "That's all I do"
>
> MALLION: "Well that's cause the price is falling.. dah.."
>
> MALLION: "There's no support"
>
> SPIVAK: "Well start supporting"
>
> MALLION: "No because there's no buying"
>
> MALLION: "Only need a little"
>
> MALLION: "Each day"
>
> MALLION: "It's easier to sell restricted stock"
>
> SPIVAK: "That's what happens when you eat ALL the seeds"
>
> Co-Conspirator 1: "So then buy!"
>
> MALLION: "Iam going the easy way iam selling restricted stock"
>
> MALLION: "What's the price anyway"
>
> MALLION "I haven't even looked at it"
>
> SPIVAK: "The shareholders are looking"
>
> Co-Conspirator 1: "1.00"

MALLION: "[Co-Conspirator 4] said he was doing a promotion"

tt.      On or about December 19, 2016, ARTHUR caused Victim-10 to send a $4,000 check to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

uu.      On or about December 19, 2016, Co-Conspirator 1 and SPIVAK exchanged a series of text messages regarding undisclosed commissions:

Co-Conspirator 1: "Am I wiring the pirates for the $25k [name redacted] check from last week?"

SPIVAK: "Yes"

Co-Conspirator 1: " Thank you"

Co-Conspirator 1: "Received $4k from Victim-10 today… I think this is Jason (ARTHUR)"

vv.      On or about December 21, 2016, SPIVAK caused the wire transfer of $2,000 to ARTHUR controlled A&M Lead bank account x5274 at Wells Fargo.

ww.      On or about December 21, 2016, SPIVAK and Co-Conspirator 1 exchanged a series of text messages MALLION and USLG shares:

SPIVAK: "Someone just [f**ked] us! Order another nobo!!!"

. . . .

Co-Conspirator 1: "If tommy boy [MALLION] isn't going to support it there's really nothing we can do. You know this right?"

SPIVAK: "He ain't doin shit!"

Co-Conspirator 1: "That's my point!!"

SPIVAK: "How many shares does he still have?"

Co-Conspirator 1: "Close to $1mm"

Co-Conspirator 1: "As far as I know!! It's a mystery"

SPIVAK: "Well we need them back"

xx.    On or about April 12, 2017, SMIRNOVA sent a text message to Co-Conspirator 1 regarding MALLION and USLG shares:

SMIRNOVA: "I guess we are going to see Richard on Friday, he's been talking with [redacted] and has a proposal. He also got out stock up over .50"

yy.    On or about June 7, 2017, CHURCH purchased 100 shares of USLG from brokerage account x5433 at TD Ameritrade for $0.35 per share.  The trade placed at 15:18:18 and was the final trade of the day at in USLG shares.  The trade increased the closing share price from $0.27 per share to $0.35 per share.

zz.    On or about July 11, 2017, CHURCH purchased 100 shares of USLG from brokerage account x5433 at TD Ameritrade for $0.39 per share.  The trade placed at 15:09:50 and was the final trade of the day at in USLG shares.  The trade increased the closing share price from $0.35 per share to $0.39 per share.

aaa.    On or about July 25, 2017, Co-Conspirator 1 and SPIVAK exchanged a series of text messages regarding the sale of USLG stock:

SPIVAK: "As soon as we can sell stock, all uslg salespeople are going on straight commission!"

SPIVAK: "No more base salary"

bbb.    On or about August 31, 2017, CHURCH caused the transfer of 73,000 free-trading shares of USLG to his Merrill Lynch brokerage account x2431.

ccc.    On or about September 29, 2017, MALLION caused the deposit of 169,123 free-trading shares into HSF Investment brokerage account x6750 at Wilson-Davis.

26

ddd.    On or about October 23, 2017, SMIRNOVA exchanged a series of text messages with Co-Conspirator 1 regarding the trading of USLG shares:

> SMIRNOVA: "Paul is asking you to check if we can get info from DTC on who is trading stock"
>
> Co-Conspirator 1: "Pretty sure the answer is no. When it's book entry it's more anonymous but I'll check when I get back"
>
> SMIRNOVA: "Paul knows for sure Richard sold 30000 shares Friday, one of the pirates told him we can get proof from dtc"

eee.    Later the same day, SMIRNOVA exchanged a series of text messages with Co-Conspirator 1 regarding the trading of USLG shares:

> SMIRNOVA: "[Co-Conspirator 4] is asking about his stock...is paul going to sign those? He refused last week and I don't know what to tell chris at this point"
>
> Co-Conspirator 1: "He said he will"

fff.    On or about November 10, 2017, HOWARD caused Victim-11 to wire transfer $10,000 to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

ggg.    On or about November 14, 2017, SPIVAK caused the ACH payment of $5,000 to HOWARD controlled account x8278 at MetaBank.

hhh.    On or about December 1, 2017, HOWARD caused Victim-6 to wire transfer $10,000 to USLG account x5187 at Huntington Bank for the purchase of USLG shares.

iii.    On or about December 14, 2017, SPIVAK caused the ACH payment of $5,000 to HOWARD controlled account x8278 at MetaBank.

jjj.     On or about March 2, 2018, CHURCH caused the wire transfer of $26,000 from Merrill Lynch brokage account x2431 to CHURCH controlled account x2853 at Bank of America.

kkk.     On or about March 5, 2018, CHURCH caused the wire transfer of $25,000 from account x2853 at Bank of America to USLG account x5187 at Huntington Bank.

lll.     On or about March 9, 2018, CHURCH purchased 100 shares of USLG from brokerage account x4807 at TradeStation for $0.59 per share.  The trade placed at 15:32:20 and was the final trade of the day at in USLG shares.  The trade increased the closing share price from $0.52 per share to $0.59 per share.

mmm.  On or about March 20, 2018, CHURCH purchased 200 shares of USLG from brokerage account x4807 at TradeStation for $0.80 per share.  The trade placed at 15:24:11 and was the final trade of the day at in USLG shares.  The trade increased the closing share price from $0.75 per share to $0.80 per share.

nnn.     On or about March 22, 2018, CHURCH caused the wire transfer of $10,000 from Merrill Lynch brokage account x2431 to CHURCH controlled account x2853 at Bank of America.

ooo.     On or about March 22, 2018, CHURCH caused the wire transfer of $10,000 from account x2853 at Bank of America to USLG account x5187 at Huntington Bank.

ppp.     On or about March 28, 2018, CHURCH caused the deposit of 70,000 shares of USLG into brokerage account x7D77 at Merrill Lynch.

qqq.     On or about April 2, 2018, CHURCH caused the transfer of 58,300 free-trading shares of USLG to brokerage account x2431 at Merrill Lynch.

rrr.  On or about April 4, 2018, CHURCH caused the wire transfer of $16,000 from Merrill Lynch brokage account x2431 to CHURCH controlled account x2853 at Bank of America.

sss.  On or about April 4, 2018, CHURCH caused the wire transfer of $15,000 from account x2853 at Bank of America to USLG account x5187 at Huntington Bank.

ttt.  On or about April 12, 2018, SMIRNOVA exchanged a series of text messages with Co-Conspirator 1 regarding the trading of USLG shares:

> Co-Conspirator 1: "Um that's a weird way to disclose the financials"
>
> SMIRNOVA: "I know! What's even more weird is that it was good enough for OTC to take the stop sign off."
>
> Co-Conspirator 1: "I don't think that will last very long though but good luck. Glad I was able to sell my shares before this"
>
> SMIRNOVA: "I'm glad you did!!! It's a good time to sell."

uuu.  On or about March 20, 2018, CHURCH purchased 200 shares of USLG from brokerage account x4807 at TradeStation for $0.80 per share.  The trade placed at 15:24:11 and was the final trade of the day at in USLG shares.  The trade increased the closing share price from $0.75 per share to $0.80 per share.

vvv.  On or about April 17, 2018, CHURCH purchased 200 shares of USLG from brokerage account x4807 at TradeStation for $1.30 per share.  The trade placed at 15:21:56 and was the final trade of the day at in USLG shares.  The trade increased the closing share price from $1.12 per share to $1.30 per share.

www.  On or about April 23, 2018, SCOTT caused the deposit of 225,000 free-trading shares of USLG into brokerage account x7409 at Merrill Lynch.

xxx.    On or about May 8, 2018, SCOTT caused a check for $12,500 from brokerage account x7409 at Merrill Lynch to be deposited into USLG account x5187 at Huntington Bank.

yyy.    On or about May 17, 2018, CHURCH caused the deposit of 100,000 free-trading shares of USLG into brokerage account x7D77 at Merrill Lynch.

zzz.    On or about May 18, 2018, CHURCH caused the transfer of 100,400 free-trading shares of USLG to brokerage account x2431 at Merrill Lynch.

aaaa.    On or about May 18, 2018, SCOTT caused the wire transfer of $12,500 from brokerage account x7409 at Merrill Lynch to USLG account x5187 at Huntington Bank.

bbbb.    On or about May 22, 2018, SPIVAK caused the wire transfer of $5,000 from USLG account x5187 at Huntington Bank to MALLION controlled Legacy Global account x7432 at Citibank.

cccc.    On or about May 24, 2018, SPIVAK caused the wire transfer of $20,000 to MATYAS controlled bank account x1867 at Wells Fargo.

dddd.    On or about May 25, 2018, SCOTT caused the wire transfer of $50,000 from brokerage account x7409 at Merrill Lynch to USLG account x5187 at Huntington Bank.

eeee.    On or about May 25, 2018, SPIVAK caused the wire transfer of $20,000 from USLG account x5187 at Huntington Bank to MALLION controlled Legacy Global account x7432 at Citibank.

ffff.    On or about May 29, 2018, SPIVAK caused the wire transfer of $20,000 to MATYAS controlled bank account x1867 at Wells Fargo.

gggg.    On or about May 30, 2018, SCOTT caused the wire transfer of $15,000 from brokerage account x7409 at Merrill Lynch to USLG account x5187 at Huntington Bank.

hhhh.   On or about May 30, 2018, SPIVAK caused the wire transfer of $7,800 from

USLG account x5187 at Huntington Bank to MALLION controlled Legacy Global

account x7432 at Citibank for proceeds of stock sales.

iiii.      On or about November 21, 2018, SPIVAK caused the wire transfer of $5,000 to

MATYAS controlled bank account x8427 at Wells Fargo.

jjjj.      On or about May 28, 2019, MATYAS caused Victim-15 to wire transfer $5,000

to USLG bank account x5187 at Huntington Bank for the purchase of USLG shares.

kkkk.   On or about May 29, 2019, SPIVAK caused the wire transfer of $2,066 to

MATYAS controlled bank account x8427 at Wells Fargo.

llll.      On or about April 22, 2019, CHURCH caused the transfer of 800,000 free-trading

shares of USLG to brokerage account x4452 at Wilson-Davis & Company.

mmmm.        On or about May 24, 2019, CHURCH caused the transfer of 800,000 free-

trading shares of USLG from brokerage account x4452 at Wilson-Davis & Company to

FJC Investment brokerage account x5008 at Wilson-Davis & Company.

nnnn.   On or about July 16, 2019, CHURCH caused the wire transfer of $20,000 from

FJC Investment Wilson-Davis & Company brokerage account x5008 to FJC Investment

Bank of America account x8729.

oooo.   On or about July 24, 2019, CHURCH caused the transfer of $3,000 from FJC

Investment Bank of America account x8729 to MALLION controlled Legacy Global

Bank of America account x2314.

pppp.   On or about July 26, 2019, CHURCH caused the transfer of $2,000 from FJC

Investment Bank of America account x8729 to MALLION controlled Legacy Global

Bank of America account x2314.

qqqq.  On or about September 24, 2019, CHURCH caused the transfer of $12,000 from FJC Investment Wilson-Davis & Company brokerage account x5008 to FJC Investment Bank of America account x8729.

rrrr.  On or about September 24, 2019, CHURCH caused the transfer of $2,000 from FJC Investment Bank of America account x8729 to MALLION controlled account Legacy Global Bank of America account x2314.

All in violation of Title 18, United States Code, Section 371.

COUNT 2
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371)

The Grand Jury charges:

53.  The allegations contained in paragraphs 1 through 47 are re-alleged and incorporated as though fully set forth herein.

54.  From on or about February 15, 2021, through on or about June 7, 2021, in the Northern District of Ohio, Eastern Division, Defendants PAUL SPIVAK, OLGA SMIRNOVA, CHARLES SCOTT, and FORREST CHURCH, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit offenses against the United States, to wit:

a.  To knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made false statements of material fact and omitting material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of US Lighting Group, Inc. ("USLG") securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud).

<u>OBJECTS OF THE CONSPIRACY</u>

55.     The objects of the conspiracy included, but were not limited to: (1) defrauding investors; (2) obtaining investor monies and paying and receiving undisclosed commissions; (3) inflating the value of USLG; and (4) enriching the conspirators.

<u>MANNER AND MEANS</u>

56.     It was part of the conspiracy that:

a.     SPIVAK, SCOTT, and CHURCH, controlled free-trading, unrestricted shares in USLG.

b.     SPIVAK, SMIRNOVA, and others, arranged for the shares to be held in the names of co-conspirators in order to avoid restrictions on his ability to sell the shares in the market.

c.     CHURCH, SCOTT, and others sought out and provided false, incomplete, and fraudulent information to attorneys in order to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing USLG stock for sale.

d.     SPIVAK, SMIRNOVA, and others, solicited would-be promoters and co-conspirators to purchase free-trading shares from other co-conspirators to sell when the stock was promoted.

e.     SPIVAK, and others, arranged to artificially inflate the price of USLG shares by creating and releasing favorable press releases and other information to promote USLG.

f.      SPIVAK, SMIRNOVA, and others, arranged to pay undisclosed commissions and kickbacks to co-conspirators who helped facilitate the sale USLG shares.

g.      SPIVAK, CHURCH, SCOTT, and others, agreed to divide up the proceeds from the sale of the USLG shares in accordance with their respective interests or commission in shares sold.

## OVERT ACTS

57.     In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendant and others performed the following overt acts, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

a.      On or about February 15, 2021, SPIVAK and SMIRNOVA had a consensually recorded meeting with an undercover federal agent ("UC-1") and a confidential human source ("CHS"), wherein SPIVAK solicited UC-1 and CHS to purchase stock from SPIVAK and USLG to sell for SPIVAK's and USLG's benefit.

b.      On or about March 5, 2021, SPIVAK and SMIRNOVA had a consensually recorded meeting at USLG's office, in the Northern District of Ohio, Eastern Division, with an undercover agent ("UC-2") and CHS, wherein SPIVAK and SMIRNOVA showed UC-2 and CHS USLG's most recent financial statements that had yet to be released to the public as part of a solicitation to purchase USLG stock held by SCOTT and CHURCH, whom SPIVAK described as "very trusted friends."

c.      On or about March 10, 2021, SPIVAK had a consensually recorded telephone call with CHS, wherein SPIVAK agreed to have SCOTT and CHURCH sell shares to an undercover federal agent posing as an investor for $25,000 each, as a "test." During this conversation, SPIVAK stated that he would need to call SCOTT and CHURCH to inform

34

them CHS was "on the team" and not an "outsider" prior to negotiating the share

purchases. SPIVAK stated after the test transactions they would negotiate the sale of the

remaining six million shares held by the SCOTT and CHURCH.

d. On or about March 16, 2021, SPIVAK had a consensually recorded telephone call

with CHS, wherein SPIVAK stated that he trusted SCOTT and CHURCH like family and

that is why they were "holding on to the corporate, free-trading stock."

e. On or about March 16, 2021, SCOTT had a consensually recorded telephone call

with CHS, wherein SCOTT agreed to execute a share purchase agreement to sell 100,000

free-trading USLG shares to UC-2 for $0.25 per share.

f. On or about March 26, 2021, SPIVAK and CHURCH caused an interstate wire

transfer of $25,000 from a government-controlled bank account to CHURCH's Bank of

America account ending in x2853 in the name of CHURCH, which was in Haleyville,

Alabama, for the purchase of 100,000 free-trading shares of USLG.

g. On or about April 1, 2021, SPIVAK and SCOTT caused an interstate wire

transfer of $25,000 from a government-controlled bank account to SCOTT's Navy

Federal Credit Union account ending in x8616 for the purchase of 100,000 free-trading

shares of USLG.

h. On or about April 2, 2021, SPIVAK caused CHURCH to send a $15,000.00 wire

transfer from CHURCH's Bank of America account ending in x2853 at USLG's

Huntington bank account ending in x5187.

i. On or about May 18, 2021, SPIVAK had a consensually recorded meeting with

CHS, wherein SPIVAK offered CHS 1.5 million shares of USLG as payment if UC-2 and

another undercover agent ("UC-3") bought all free-trading shares held by SCOTT and

CHURCH. During this meeting, SPIVAK explained that he would have to give CHS the shares "as a consultant" and discussed drafting a consulting agreement between USLG and the name of a to-be determined consulting company to effectuate the transfer.

j.      During the same meeting, SPIVAK raised with CHS the need to come up with a cover story if they were questioned by the authorities. SPIVAK asked CHS what they would say "when they got busted." SPIVAK also asked CHS if he had an iPhone and instructed CHS to use FaceTime to communicate because "you can't listen in." SPIVAK later told CHS what they were doing was "against SEC rules."

k.      On or about May 26, 2021, SCOTT had a consensually recorded meeting with the CHS, wherein SCOTT told the CHS that SCOTT had 1,700,000 free-trading shares of USLG, and SCOTT was going to get more shares. SCOTT stated that SPIVAK wanted SCOTT to sell the "lion share" of his (SCOTT) shares. SCOTT later added that he was going to do what SPIVAK suggests.

l.      On or about June 2, 2021, SPIVAK, and SMIRNOVA had a consensually recorded meeting with CHS, wherein SPIVAK told the CHS that SPIVAK did not want to have any of these conversations around the office. SPIVAK told the CHS that he was holding up USLG's S-1 filing so SPIVAK could issue the CHS stock for arranging the deal with SCOTT and CHURCH. SPIVAK asked SMIRNOVA how they could conceal the stock issuance to the CHS from the UCEs, the CFO, and others. SMIRNOVA suggested they use a consulting agreement to issue the shares to the CHS. SPIVAK told the CHS that SPIVAK wanted someone in Europe, like UCE-3, who can promote stocks in Europe. SMIRNOVA, SPIVAK, and the CHS agree that the reason listed for the share issuance to the CHS will be labeled "European expansion consulting."

m.    Later in the same meeting, SPIVAK discussed his desire to set up a call room near Barcelona, Spain to help SPIVAK raise $10,000,000 to $20,000,000. SPIVAK stated that he learned from the SEC attorney, that the SEC did not care what SPIVAK does outside of the country. SPIVAK also stated that he learned from the SEC that there cannot be a "mathematical formula" for payments made based on money raised, so SPIVAK was going to issue the CHS an odd number of shares to conceal the shares as payment of a commission.

n.    On or about June 8, 2021, SPIVAK provided the CHS with a fraudulent consulting agreement to issue the CHS 1,585,000 shares for arranging the scheme with SPIVAK, SCOTT, and CHURCH.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT 3-22</u>
(Securities Fraud, 15 U.S.C. §§ 78j(b), 78ff and Title 17 C.F.R. § 240.10b-5)

The Grand Jury further charges:

58.    The factual allegations contained in paragraphs 1 through 47, 51, 52, 56, and 57, are re-alleged and incorporated as though fully set forth herein.

59.    On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL SPIVAK, RICHARD MALLION, JASON ARTHUR, DONALD HOWARD, CHARLES SCOTT, FORREST CHURCH, LARRY MATYAS, and others known and unknown to the Grand Jury, did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstates commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue statements of material fact, and omitting to

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of the securities in US Lighting Group, Inc., each act below constituting a separate count of this Superseding Indictment:

| Count | Approximate Date Sale to Investor(s) | Approximate Number of Shares | Ticker Symbol | Defendant(s) Charged | Proceed of Stock Sale |
|---|---|---|---|---|---|
| 3 | September 28, 2016 – December 5, 2016 | 330,877 | USLG | MALLION | $445,735.53 |
| 4 | October 6, 2017 – November 20, 2017 | 169,123 | USLG | MALLION | $54,974.07 |
| 5 | October 14, 2016 | 20,000 | USLG | SPIVAK, ARTHUR | $5,000.00 |
| 6 | October 14, 2016 | 10,000 | USLG | SPIVAK, ARTHUR | $5,000.00 |
| 7 | October 14, 2016 | 10,000 | USLG | SPIVAK, ARTHUR | $5,000.00 |
| 8 | November 4, 2016 | 300,000 | USLG | SPIVAK | $150,000 |
| 9 | November 15, 2016 | 50,000 | USLG | SPIVAK | $25,000 |
| 10 | December 15, 2016 | 50,000 | USLG | SPIVAK | $25,000 |
| 11 | November 14, 2017 | 40,000 | USLG | SPIVAK, HOWARD | $20,000 |
| 12 | December 6, 2017 | 40,000 | USLG | SPIVAK, HOWARD | $10,000 |
| 13 | April 25, 2018 – June 6, 2018 | 225,000 | USLG | SCOTT | $262,896.63 |
| 14 | September 19, 2017 – February 21, 2018 | 39,100 | USLG | CHURCH | $22,205.58 |
| 15 | March 29, 2018 – April 13, 2018 | 70,000 | USLG | CHURCH | $95,270.48 |
| 16 | May 29, 2018 – September 26, 2018 | 100,000 | USLG | CHURCH | $119,231.38 |
| 17 | October 9, 2018 – November 2, 2018 | 58,950 | USLG | CHURCH | $55,050.77 |
| 18 | October 15, 2018 | 140,000 | USLG | SPIVAK, MATYAS | $35,000 |
| 19 | November 15, 2018 | 50,000 | USLG | SPIVAK, MATYAS | $12,500 |

| Count | Approximate Date Sale to Investor(s) | Approximate Number of Shares | Ticker Symbol | Defendant(s) Charged | Proceed of Stock Sale |
|---|---|---|---|---|---|
| **20** | April 1, 2021 | 100,000 | USLG | SPIVAK, SCOTT | $25,000 |
| **21** | June 26, 2019 – April 29, 2021 | 265,550 | USLG | CHURCH | $151,782.42 |
| **22** | April 16, 2021 | 100,000 | USLG | SPIVAK, CHURCH | $25,000 |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

COUNTS 23-43
(Wire Fraud, 18 U.S.C. 1343)

The Grand Jury further charges:

60.     The factual allegations contained in paragraphs 1 through 47, 51, and 52 are re-alleged and incorporated as though fully set forth herein.

61.     From in or around 2016, through in or around 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL SPIVAK, JASON ARTHUR, DON HOWARD, LARRY MATYAS, and others known and unknown to the Grand Jury, knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

62.     On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants listed below, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals, pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit: electronic communications and electronic transfers of funds which Defendants and others caused to be sent to, and received, as described

39

below, each wire communication or transfer of funds constituting a separate count of this

Superseding Indictment:

| Count | Approximate Date | Approximate Amount | Originating Bank | Receiving Bank | Defendant(s) Charged |
|-------|------------------|--------------------|------------------|----------------|----------------------|
| 23 | September 16, 2016 | $7,500 | SunTrust Bank | Huntington Bank | SPIVAK, MALLION |
| 24 | September 16, 2016 | $5,000 | TD Bank | Huntington Bank | SPIVAK, ARTHUR |
| 25 | September 19, 2016 | $5,000 | Huntington Bank | Wells Fargo | SPIVAK, ARTHUR |
| 26 | September 23, 2016 | $7,500 | SunTrust Bank | Huntington Bank | SPIVAK, MALLION |
| 27 | September 30, 2016 | $10,000 | SunTrust Bank | Huntington Bank | SPIVAK, MALLION |
| 28 | October 4, 2016 | $5,000 | SunTrust Bank | Huntington Bank | SPIVAK, MALLION |
| 29 | October 13, 2016 | $5,000 | US Bank | Huntington Bank | SPIVAK, ARTHUR |
| 30 | October 21, 2016 | $50,000 | Bank of West | Huntington Bank | SPIVAK |
| 31 | October 25, 2016 | $22,500 | Huntington Bank | Wells Fargo Bank | SPIVAK |
| 32 | November 3, 2016 | $7,000 | Chartway FCU | Huntington Bank | SPIVAK |
| 33 | November 3, 2016 | $25,000 | BAC Community Bank | Huntington Bank | SPIVAK |
| 34 | December 19, 2016 | $4,000 | WECU | Huntington Bank | SPIVAK, ARTHUR |
| 35 | December 22, 2016 | $2,000 | Huntington Bank | Wells Fargo | SPIVAK, ARTHUR |
| 36 | November 10, 2017 | $10,000 | Bank of America | Huntington Bank | SPIVAK, HOWARD |
| 37 | November 10, 2017 | $5,000 | Huntington Bank | MetaBank | SPIVAK, HOWARD |
| 38 | December 1, 2017 | $10,000 | JP Morgan Chase Bank | Huntington Bank | SPIVAK, HOWARD |
| 39 | December 14, 2017 | $5,000 | Huntington Bank | MetaBank | SPIVAK, HOWARD |
| 40 | October 15, 2018 | $35,000 | Morrell & James Bank | Huntington Bank | SPIVAK, MATYAS |
| 41 | October 18, 2018 | $14,000 | Huntington Bank | Wells Fargo Bank | SPIVAK, MATYAS |

| Count | Approximate Date | Approximate Amount | Originating Bank | Receiving Bank | Defendant(s) Charged |
|-------|------------------|--------------------|------------------|----------------|----------------------|
| 42 | November 16, 2018 | $12,500 | Great Southern Bank | Huntington Bank | SPIVAK, MATYAS |
| 43 | November 21, 2018 | $5,000 | Huntington Bank | Wells Fargo Bank | SPIVAK, MATYAS |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS 44-47
(Wire Fraud, 18 U.S.C. 1343)

The Grand Jury further charges:

63.     The factual allegations contained in paragraphs 1 through 47, 56, and 57 are re-alleged and incorporated as though fully set forth herein.

64.     From on or about February 15, 2021, through on or about June 7, 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL SPIVAK, FORREST CHURCH, CHARLES SCOTT, and others known and unknown to the Grand Jury, knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

65.     On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants listed below, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals, pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit: electronic communications and electronic transfers of funds which Defendants and others caused to be sent to, and received, as described below, each wire communication or transfer of funds constituting a separate count of this Superseding Indictment:

41

| Count | Approximate Date | Approximate Amount | Originating Bank | Receiving Bank | Defendant(s) Charged |
|---|---|---|---|---|---|
| 44 | March 26, 2021 | $25,000 | Bank of America | Bank of America | SPIVAK, CHURCH |
| 45 | April 1, 2021 | $25,000 | PNC Bank | Navy Federal Credit Union | SPIVAK, SCOTT |
| 46 | April 2, 2021 | $15,000 | Bank of America | Huntington Bank | SPIVAK, CHURCH |
| 47 | April 5, 2021 | $15,000 | Navy Federal Credit Union | Huntington Bank | SPIVAK, SCOTT |

All in violation of Title 18, United States Code, Sections 1343 and 2.


A TRUE BILL.


Original document  - Signatures on file with the Clerk of Courts, pursuant to the E-Government

Act of 2002.


42