IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21CR491 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL SPIVAK, | ) | UNITED STATES' TRIAL BRIEF |
| OLGA SMIRNOVA, | ) | |
| CHARLES SCOTT, | ) | |
| | ) | |
| Defendants. | ) | |

The United States of America, by and through its counsel, Rebecca C. Lutzko, United

States Attorney, and Elliot D. Morrison, Megan R. Miller, and Stephanie A. Wojtasik, Assistant

United States Attorneys, respectfully submits the following trial brief in accordance with this

Court's Trial Order.

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:  /s/ Megan R. Miller
Elliot D. Morrison (OH: 0091740)
Megan R. Miller (OH: 0085522)
Stephanie A. Wojtasik (OH: 0097858)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3919/3855/3856
(216) 522-8355 (facsimile)
Elliot.Morrison@usdoj.gov
Megan.R.Miller@usdoj.gov
Stephanie.Wojtasik@usdoj.gov

## Table of Contents

I.   STATEMENT OF THE FACTS ..................................................................5

    A.   PHASE 1 ..........................................................................................5

    B.   PHASE 2 ..........................................................................................7

    C.   PHASE 3 ........................................................................................10

II.  CONTROLLING LAW.........................................................................11

    A.   COUNTS 1 AND 2 – CONSPIRACY TO COMMIT A FEDERAL OFFENSE – 18 U.S.C. § 371 ................................................................11

    B.   COUNTS 5-13, 18-20, AND 22 – SECURITIES FRAUD – 15 U.S.C. §§ 78J(B) AND 78FF AND 17 C.F.R. § 240.10B-5 ................................13

    C.   COUNTS 23-47 – WIRE FRAUD – 18 U.S.C. § 1343.........................15

    D.   COUNT 49 – FALSE DECLARATIONS BEFORE THE COURT – 18 U.S.C. § 1623(A) ............................................................................16

III. THE GOVERNMENT MAY INTRODUCE DEFENDANTS' OUT-OF-COURT STATEMENTS. .....................................................................17

    A.   NON-HEARSAY STATEMENTS........................................................17

    B.   STATEMENTS BY A PARTY OPPONENT .........................................19

    C.   STATEMENTS BY A PARTY'S EMPLOYEE .....................................20

    D.   COCONSPIRATOR STATEMENTS ...................................................21

IV.  THE GOVERNMENT MAY INTRODUCE EVIDENCE THAT POST-DATES THE COUNT 1 CONSPIRACY. ......................................................23

    A.   THE EVIDENCE IS PROBATIVE OF DEFENDANTS' KNOWLEDGE AND INEXPLICABLY INTERTWINED WITH THE COUNT 1 CONSPIRACY......30

    B.   ADDITIONALLY, THE PROFFERED EVIDENCE IS ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 404(B)..............................................32

    C.   EVIDENCE OF SPIVAK'S EFFORTS TO DELETE EVIDENCE AND TAMPER WITH WITNESSES IS ADMISSIBLE CONSCIOUSNESS-OF-GUILT EVIDENCE................................................................................36

    D.   THE GOVERNMENT'S DISCLOSURE WAS TIMELY...................38

**V.    THE GOVERNMENT MAY CHOOSE WHICH PORTIONS OF DEFENDANTS'**
      **STATEMENTS TO ADMIT** .......................................................................................40

**VI.   DEFENDANTS' EVIDENCE AND DEFENSES MUST BE RELEVANT** ...............41

   A.   THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT
        REGARDING ANY PURPORTED BELIEF OF "NO ULTIMATE HARM" TO
        INVESTORS ..........................................................................................................43

   B.   THE COURT SHOULD PRECLUDE ARGUMENT THAT THE VICTIM-
        INVESTORS WERE "UNREASONABLE VICTIMS" OR THAT OTHERWISE
        BLAMES THE VICTIMS. .....................................................................................45

   C.   THE COURT SHOULD PRECLUDE DEFENDANTS FROM INTRODUCING
        PRIOR GOOD ACTS. ............................................................................................47

        1.   Federal Rules of Evidence 404(b) and 405 bar the admission of character
             evidence in the form of Defendants' prior "good acts." ............................47

        2.   The Government Should Be Permitted to Rebut Defendants' Character
             Evidence..................................................................................................49

   D.   THE COURT SHOULD PRECLUDE AN ADVICE OF COUNSEL DEFENSE.
        ..............................................................................................................................50

   E.   THE COURT SHOULD PRECLUDE ARGUMENT THAT DEFENDANTS'
        CONDUCT WAS ACCEPTED WITHIN THE SECURITIES INDUSTRY. ......52

   F.   THE COURT SHOULD PRECLUDE DEFENDANTS FROM PLACING THE
        INVESTIGATION ON TRIAL. .............................................................................55

   G.   THE COURT SHOULD PRECLUDE ANY ARGUMENT REGARDING
        SELECTIVE PROSECUTION OF THE DEFENDANTS....................................58

   H.   THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT
        CONCERNING THE PUNISHMENT OR COLLATERAL CONSEQUENCES
        OF A CONVICTION...............................................................................................59

**VII.  DEFENDANTS SPIVAK AND SMIRNOVA ARE NOT ENTITLED TO A JURY**
       **INSTRUCTION ON ENTRAPMENT.** ...........................................................................60

   A .  DEFENDANTS SPIVAK AND SMIRNOVA CANNOT SHOW THAT THE
        GOVERNMENT INDUCED THEM TO COMMIT SECURITIES FRAUD. .....61

   B.   DEFENDANTS SPIVAK AND SMIRNOVA CANNOT SHOW THAT THEY
        LACKED PREDISPOSITION TO COMMIT SECURITIES FRAUD. ...............65

C.     IF SPIVAK OR SMIRNOVA RAISE ENTRAPMENT TO THE JURY, OR IF THE COURT PERMITS AN ENTRAPMENT DEFENSE, THE GOVERNMENT MAY INTRODUCE EVIDENCE OF SPIVAK AND SMIRNOVA'S CHARACTER. .................................................................67

**VIII. ADDITIONAL EVIDENTIARY CONSIDERATIONS**.................................................68

A.     GOVERNMENT WITNESS TESTIFYING PURSUANT TO PLEA AGREEMENT ....................................................................................................68

B.     SUMMARY EVIDENCE ....................................................................................69

**IX. TRIAL ADMINISTRATION** ...........................................................................................70

A.     THE SECOND SUPERSEDING INDICTMENT SHOULD BE SUBMITTED TO THE JURY. ...................................................................................................70

B.     THE COURT SHOULD PERMIT THE UNITED STATES TO HAVE TWO CASE AGENTS REMAIN IN THE COURTROOM DURING TRIAL..............71

**X. CONCLUSION** ...................................................................................................................72

## I.   STATEMENT OF THE FACTS

### A.   PHASE 1

In Phase 1 of the trial, the United States intends to offer evidence of the following:

Defendants Paul Spivak ("Spivak"), Olga Smirnova ("Smirnova"), and Charles Scott ("Scott") conspired to defraud investors in U.S. Lighting Group, Inc. ("USLG") by issuing millions of shares to Spivak and Scott and then artificially controlling the trading volume and price of the shares.  Spivak, who was Chief Executive Officer of USLG, controlled a substantial number of outstanding, restricted, and free-trading shares of USLG.  Scott, Spivak's close friend, likewise controlled a substantial number of outstanding restricted and free-trading shares of USLG and had a profit-sharing arrangement with Spivak from the proceeds of USLG stock shares.  Smirnova, Spivak's wife, was the Vice President of Finance of USLG and orchestrated undisclosed kickbacks to unregistered brokers for the sale of free-trading and restricted USLG stock.

More specifically, beginning in early 2016, Spivak, who was Chief Executive Officer of USLG, and co-conspirator Richard Mallion ("Mallion"), a securities fraud recidivist, agreed to acquire a publicly traded shell company, The Luxurious Travel Corp ("LXRT"), which would be used to take USLG public via a reverse merger.  As part of the agreement, Spivak would continue to run USLG and Mallion would remain "non-affiliated" with USLG, which would enable Mallion to sell free-trading shares under applicable Securities and Exchange Commission ("SEC") regulations.  Spivak funded the purchase of LXRT through the sale of USLG restricted shares, which shares Mallion and co-conspirator Jason Arthur ("Arthur") solicited investors to purchase at $.50 per share.  Scott also raised money for Spivak and referred individual investors to Mallion.  After the money was raised, on June 28, 2016, Spivak and Scott, with Mallion's assistance, purchased millions of shares of LXRT for approximately $225,000, effectively

acquiring the control block of LXRT—Spivak acquired 23,275,000 shares of LXRT (77.03%), and Scott acquired 1,225,000 shares (4.07%). Subsequently, on July 13, 2016, LXRT merged with USLG, making USLG a public company.

For his part, in August and September 2016, Mallion acquired a total of 1,500,000 shares of LXRT, which were issued to HSF Investments—an entity Mallion controlled and used to conceal his involvement in USLG. To profit from the newly public USLG, Spivak and Mallion agreed that Mallion would sell the 1,500,000 free-trading shares in Mallion's control, and Mallion would kickback proceeds of the free-trading stock sales to Spivak and USLG. Contemporaneously, Mallion also sold restricted shares and additional free-trading shares in private transactions and kicked back proceeds of those stock sales to Spivak and USLG as well.

Immediately after USLG went public, Spivak intentionally sought out and hired unregistered brokers—including Mallion, Arthur, co-conspirators Christopher Bongiorno ("Bongiorno"), Larry Matyas ("Matyas"), Robert Carver ("Carver"), and others—to solicit the investing public to purchase both restricted and free-trading shares of USLG. The unregistered brokers received commissions of up to 50% of the investment, which neither USLG nor the unregistered brokers disclosed to the investors. Spivak and Smirnova tracked the commissions to which the unregistered brokers were entitled for each sale of restricted stock. To justify these commission payments and conceal them as other services, Spivak executed consulting agreements with the unregistered brokers. The unregistered brokers, in turn, provided fraudulent invoices to Smirnova that disguised commission payments as "consulting" or "marketing" payments. Smirnova and others then issued the resulting commission payments.

To make the restricted stock investments more attractive to the investing public and to provide a mechanism for Mallion to liquidate the 1,500,000 free-trading USLG share, Spivak

and Mallion also hired and paid for call room stock promotions, using a middleman to conceal their connection.  Mallion paid a percentage of free-trading stock sales back to the middleman who hired call rooms to solicit investors to purchase free-trading shares and also kicked back proceeds to Spivak and USLG.

Additionally, beginning in at least 2017, Spivak, Scott, Mallion, co-conspirator Forrest Church ("Church"), and others also artificially inflated the share price of free-trading shares of USLG, including through manipulative stock trading techniques such as "painting the tape" and "marking the close."  For example, on July 3, 2017, Scott purchased 500 shares of free-trading USLG stock to give the appearance that the stock was trading in the open market.

Later in 2018 and 2019, Spivak recruited Scott and Church to acquire a combined approximately 3,000,000 free-trading shares of USLG on his behalf.  Scott and Church then sold a portion of these shares in the open market and kicked back proceeds of the sales to Spivak and USLG.  Scott and Church disguised the kickbacks as reinvestments in USLG through the purchase of new restricted shares.

In total, Defendants and their co-conspirators fraudulently raised approximately $8.26 million from the sale of restricted shares.

B.    PHASE 2

In Phase 2, the United States intends to offer evidence of the following:

Spivak, Smirnova, Scott, and others again conspired to defraud would-be investors in USLG by: (1) concealing Spivak's beneficial ownership in free trading shares held in the name of Scott and Church; (2) arranging to pay undisclosed commissions and kickbacks to co-conspirators who helped facilitate the sale of the USLG shares; and (3) soliciting co-conspirators, who were in fact FBI Undercover Employees ("UCEs"), to: (i) purchase free-trading shares from Scott and Church; (ii) kick back a portion of the proceeds to Spivak and USLG; (iii) promote

USLG's stock by coordinating the issuance of press releases by USLG with a planned promotional program; and (iv) sell the inflated shares to the investing public.

More specifically, on February 15, 2021, FBI Undercover Employee-1 ("UCE-1"), and a cooperating witness ("CHS") had a consensually recorded in-person meeting with Spivak and Smirnova.  CHS and UCE-1 each portrayed investors.  During the meeting, Spivak solicited UCE-1 and CHS to purchase stock from Spivak and USLG to sell for Spivak and USLG's benefit.  Under the arrangement, UCE-1, CHS, and their associates would purchase shares of USLG at $0.50 per share, sell the shares for $1.00 per share, and use the money to purchase more shares at $.50 from USLG.

On February 16, 2021, CHS had a consensually recorded in-person meeting with Spivak and Smirnova.  Spivak told CHS that all the convertible notes had been converted in USLG except for one.  Spivak stated that if CHS purchased the note from the investor that held the note, Spivak could issue a press release stating all the notes had been converted.

On March 5, 2021, UCE-2 and CHS had a consensually recorded in-person meeting with Spivak and Smirnova at USLG's office.  UCE-2 portrayed a wealthy investor interested in purchasing share of USLG.  During the meeting, Spivak told Smirnova to "go in and grab the top-secret document and bring it in here," which contained USLG's most recent financial statements that had yet to be released to the public as part of a solicitation to purchase USLG stock held by Scott and Church, whom Spivak described as "very trusted friends."  Spivak then told UCE-2 and CHS how they were going to make money with the stock.  According to Spivak, once the stock price rose, Scott and Church would sell off the stock and buy more stock from the company.  Spivak stated that they would not sell the stock for $0.15 per share and the purchase

price would likely be higher than the open market prices.  Spivak explained that the shares were technically company stock, but if the company owned the shares, they would not be free trading.

On March 10, 2021, CHS had a consensually recorded telephone call with Spivak, wherein Spivak agreed to have Scott and Church sell shares to CHS for $25,000 as a test. During this conversation, Spivak told CHS that Spivak needed to call Scott and Church to let them know CHS was "on the team" and not an "outsider" before negotiating the share purchases.

On March 16, 2021, Spivak had a consensually recorded call with CHS, wherein Spivak stated that he trusted Scott and Church like family and that is why they were "holding on to the corporate, free-trading stock."  That same day, Scott had a consensually recorded call with CHS, wherein Scott agreed to execute a share purchase agreement to sell 100,000 free-trading USLG shares to UCE-2 for $0.25 per share.  Subsequently, on March 26, 2021, and April 1, 2021, the government sent an interstate wire transfer of $25,000 to Church and $25,000 to Scott each for the purchase of 100,000 free-trading shares of USLG.

In various recorded conversations and meetings in April 2021, Spivak continued to discuss issuing a press release and instituting a marketing campaign to promote the sale of USLG stock.  During these calls, Spivak made statements describing himself as the "press release king" and lamenting that he had "perfectly good press releases that are being wasted."

On May 18, 2021, Spivak had a consensually recorded meeting with CHS, wherein Spivak offered CHS 1.5 million shares of USLG as payment if UCE-2 and another undercover agent ("UCE-3") bought all free-trading shares that Scott and Church held.  During the meeting, Spivak explained that he would have to give CHS the shares "as a consultant" and discussed drafting a consulting agreement between USLG and the name of a to-be-determined consulting

company to effectuate the transfer.  During the same meeting, Spivak asked CHS to come up with a cover story for what they would say "when they got busted."

On May 26, 2021, Scott had a consensually recorded meeting with CHS, wherein Scott told CHS that Scott had 1,700,000 free-trading shares of USLG and that Spivak wanted Scott to sell the "lion share" of Scott's shares.  During that meeting, Scott and others also discussed CareClix, another microcap company, and setting up a fraud scheme for its stock.

On June 2, 2021, Spivak and Smirnova had a consensually recorded meeting with CHS wherein Spivak told CHS that Spivak did not want to have any of these conversations around the office.  Spivak told the CHS that he was holding up USLG's filing so Spivak could issue stock to CHS for arranging the deal with Scott and Church.  Spivak asked Smirnova how they could conceal the stock issuances to the CHS, and Smirnova suggested using a consulting agreement.

On June 8, 2021, Spivak then provided CHS with a fraudulent consulting agreement to issue CHS 1,585,000 shares for arranging the scheme with Spivak, Scott, and Church.

C.     PHASE 3

In Phase 3 of the trial, the United States intends to offer evidence of the following:

On June 28, 2021, a Magistrate Judge in the Northern District of Ohio was conducting a hearing to determine whether Spivak posed a serious flight risk or serious risk of obstruction and threat to witnesses.  It thus was material to the proceeding for the Court to ascertain whether Spivak had secret rooms, cabinets, and compartments in his home that were used or could be used to store weapons.

Spivak, while under oath and testifying in that proceeding, knowingly made a false material declaration.  Specifically, when asked whether Spivak could store weapons in a hidden compartment behind a mirror, Spivak responded: "No.  It is very shallow.  I store the titles from

10

my car.  Three was about twelve cars and titles were in there, my passport is in there, important documents were in there."  He further testified:

Q.      Okay.

A.      It is only about mid six.

Q.      And you would say about two inches?

A.      Yes.

Q.      And how do you open it?

A.      With a magnet, and I believe my wife told them about it, and we weren't hiding anything.

The government will demonstrate that this statement was false and that Spivak knew it was false through reference to recorded conversations between Spivak and Smirnova on June 10, 2021.  During those conversations, Spivak directed Smirnova to remove an AR-15 from the compartment hidden behind the mirror in the bedroom.  The government also will introduce evidence from the FBI agent(s) who searched Spivak's home, located the secret compartment behind the mirror in the bedroom, photographed the compartment, and independently researched its specifications.

## II.      CONTROLLING LAW

The Second Superseding Indictment alleges that Defendants Spivak, Smirnova, and Scott committed the following violations of federal law:

### A.      COUNTS 1 AND 2 – CONSPIRACY TO COMMIT A FEDERAL OFFENSE – 18 U.S.C. § 371

Counts 1 and 2 alleged that the defendants conspired to commit certain federal offenses, namely Securities Fraud in violation of 15 U.S.C. §§ 78j and 78ff and 17 C.F.R. § 240.10b-5. The government must prove the following elements beyond a reasonable doubt:

- Two or more persons conspired, or agreed, to commit the crime of Securities Fraud;

11

- The defendant knowingly and voluntarily joined the conspiracy; and

- A member of the conspiracy did one of the overt acts described in the Second Superseding Indictment for the purpose of advancing or helping the conspiracy.

Pattern Crim. Jury Instr. 6th Cir. 3.01A (Mar. 2023).

For the first element, the government must prove that the defendants agreed to commit one or more offenses against the United States. As this Circuit's Pattern Instructions make clear, this does not require proof of any formal agreement nor proof that everyone involved agreed on all the details of the conspiracy. *Id.* Instr. 302. Rather, the government must prove that there is a mutual understanding, spoken or unspoken, between two or more people, to cooperate with each other to commit Securities Fraud. *Id.*

The second element requires the government to establish that each defendant knowingly and voluntarily joined the conspiracy—*i.e.*, that he or she knew the conspiracy's main purpose, and voluntarily joined it intending to help advance or achieve its goals. Pattern Crim. Jury Instr. 6th Cir. 3.03 (Mar. 2023). The government's proof of Defendants' knowledge is discussed more fully in this brief below. But simply put, the Defendants' communications among themselves and their co-conspirators—and the actions that resulted from those communications—will demonstrate each Defendants' knowledge and intent to join the conspiracy.

The final element is that one or more of the conspiracy members committed one or more of the overt acts described in the Second Superseding Indictment to help advance the conspiracy. *See* Pattern Crim. Jury Instr. 6th Cir. 3.04 (Mar. 2023). The Second Superseding Indictment alleges numerous overt acts performed throughout the course of the conspiracy, and the government will prove their existence through evidence of financial transactions, documents, and various communications, including text messages, email, telephone, and in-person conversations,

that the Defendants and their coconspirators performed.

B.    COUNTS 5-13, 18-20, AND 22 – SECURITIES FRAUD – 15 U.S.C. §§ 78J(B) AND 78FF AND 17 C.F.R. § 240.10B-5

The above-listed counts charge Defendants Spivak and Scott with Securities Fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.  This crime has three elements:

- That in connection with the sale of USLG stock, the defendant did any one of the following:

  - Employed any device, scheme, or artifice to defraud; or

  - Made any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

  - Engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase of sale of USLG stock.

- That the defendant acted willfully, knowingly, and with the intent to defraud; and

- That the defendant knowingly used, or caused to be used, any means or instrumentality of interstate commerce in furtherance of the fraudulent conduct.

3 Model Federal Jury Instructions—Criminal, ¶ 57.03 (2024).

For the first element, the government must prove that Defendant engaged in unlawful conduct, in one or more of the three ways enumerated in the jury instruction, in connection with the sale of USLG stock.  The government's proof of fraud encompasses multiple methods of manipulative and deceptive acts, including: (1) concealing Spivak's beneficial ownership in free-trading shares; (2) engaging in manipulative stock trading techniques; (3) failing to disclose that unregistered brokers received commissions upwards of 50% per investment; (4) lying to investors about the anticipated use of proceeds; (5) concealing the misappropriation of such proceeds; and (6) misrepresenting the status of USLG's performance.

13

The second element is that the defendant acted knowingly and willfully, that is, that Spivak and Scott's actions were deliberate and done on purpose, not by mistake or accident.  *See United States v. McGahee*, 257 F.3d 520, 529 (6th Cir. 2001) (government must prove defendant acted knowingly and willfully); *see also United States v. Parrish*, 238 F.3d 425, at *3 (6th Cir. 2000) (quoting with approval the district court's definition of "knowingly" as an "act . . . done voluntarily and willfully and not because of mistake or accident or other innocent reason" and "willfully" as "[a]n act . . . done voluntarily and intentionally and with the specific intent to do something the law forbids").  In the context of this case, the government will prove that the Defendants acted knowingly and willfully through their communications vis-à-vis their co-conspirators, the natural consequences of their resultant actions, and the extent to which they profited from the fraud scheme.

The third element, which is jurisdictional, is that the defendant used a means or instrumentality interstate commerce.  The government will prove this element through a series of financial transaction between: (1) financial institutions based in Ohio and those based outside Ohio; and (2) financial institutions based outside Ohio and those in Ohio, both of which caused transmissions of a signal by means of wire communication in interstate commerce.

The Second Superseding Indictment also charges Defendants with aiding and abetting securities fraud.  As set forth in the proposed jury instructions, even if the jury determines that the defendants did not personally commit the crime, the government asserts that the jury could find that Spivak, Smirnova, and Scott did something to help or encourage the crime with the intent that the crime be committed.  In this respect, at a minimum the government will introduce evidence that Spivak and Smirnova each monitored the sale of USLG stock with the intent to unlawfully obtain and keep proceeds from the stock sales and that Scott held stocks on Spivak's

behalf, also with the intent to unlawfully obtain and keep proceeds.

C.      COUNTS 23-47 – WIRE FRAUD – 18 U.S.C. § 1343

Counts 23 through 47 of the Second Superseding Indictment charge Defendants Spivak
and Scott with Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 2.
This crime has four elements:

- That the defendant knowingly participated in, devised, or intended to devise a scheme to
  defraud in order to deprive another of money or property;

- That the scheme included a material misrepresentation or concealment of a material fact;

- That the defendant had the intent to defraud; and

- That the defendant used or caused another to use wire, radio, or television
  communications in interstate commerce in furtherance of the scheme.

Pattern Crim. Jury Instr. 6th Cir. 10.02 (Mar. 2023).

Similar to the securities fraud charges, the first element—that defendant participated in,
devised, or intended to devise a scheme to defraud—will be established through the numerous
manipulative and deceptive acts that defendants employed in connection with the sale of USLG
stock.  The individual counts include payments that investors caused to be issued to USLG to
purchase stock, and the individual investors will testify regarding material misrepresentations
and concealments on which they relied in purchasing the stock.  In this regard, the government
will establish the materiality element.  Like the securities fraud charge, the Defendants' intent
will be established through their communications vis-à-vis their co-conspirators, the natural
consequences of their resultant actions, and the extent to which they profited from the fraud
scheme.  And the fourth element, the jurisdictional wire fraud transmission, again will be
established through interstate financial transactions.

The Second Superseding Indictment also charges Defendants with aiding and abetting

15

wire fraud.  Again, even if the jury determines that the Defendants did not personally commit the crime, the government asserts that it could find that they did something to help or encourage the crime with the intent that the crime be committed.

     D.     COUNT 49 – FALSE DECLARATIONS BEFORE THE COURT – 18 U.S.C. § 1623(A)

Count 49 of the Second Superseding Indictment charges Spivak with False Declarations Before the Court in violation of Title 18, United States Code, Section 1623(a). This crime has four elements:

- That the testimony before the court was given while the defendant was under oath;

- That such testimony was false as set forth in the Second Superseding Indictment;

- That the matters as to which it is charged that defendant gave false testimony were material to the issues under inquiry by the court; and

- That such false testimony was given knowingly.

2 Modern Federal Jury Instructions—Criminal, ¶ 48.18 (2024).

The first element—that the testimony was given under oath—is readily satisfied.  It is apparent from the official transcript that Spivak was under oath, and the FBI agent who observed the proceeding likewise can confirm that Spivak was under oath at the time of his statements.

The second element requires the jury to find that the charged testimony was false.  In this regard, the government will establish through the hearing transcript, witness testimony, documentary and photographic evidence, and a commonsense reading of the surrounding questions and context that Spivak lied about the size and purpose of the secret compartment.

The third element requires that the falsity be material to the underlying proceeding.  The government will introduce evidence that the hearing was designed to determine whether Spivak was a danger to the community or a flight risk, from which a jury could readily find that

Spivak's possession of and access to firearms was material.

The government will establish the fourth element—that Spivak knowingly falsified his testimony—through his obvious familiarity with his own residence and his call with Smirnova mere days before asking Smirnova to remove the AR-15 from the secret compartment.

## III.   THE GOVERNMENT MAY INTRODUCE DEFENDANTS' OUT-OF-COURT STATEMENTS.

The United States intends to offer out-of-court statements made by the Defendants. These statements will be admissible under one or more of the following theories: (1) the statements are non-hearsay; (2) the statements were made by a party opponent pursuant to Federal Rule of Evidence 801(d)(2)(A); (3) the statements were made by a party agent or employee pursuant to Federal Rule of Evidence 801(d)(2)(D); (4) the statements were made by a coconspirator pursuant to Federal Rule of Evidence 801(d)(2)(E); or (5) the statements are subject to another specific hearsay exception.[1]

### A.   NON-HEARSAY STATEMENTS

A portion of the Defendants' out-of-court statements are not subject to the rule against hearsay because they are not being offered for the truth of the matter asserted.  Federal Rule of Evidence 801(c) defines hearsay as an out-of-court statement offered to prove the truth of the matter asserted.  *See United States v. Johnson*, 71 F.3d 539, 543 (6th Cir. 1995).  As such, an out-of-court statement is not hearsay if (1) it does not contain an assertion, *see United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003), or (2) it is not offered to prove the truth of what it

---

[1] Given the vast number of statements involved in this case, this section is not intended as an exhaustive list of every out-of-court statement that may be introduced by the United States at trial.  Rather, this section is intended to outline the legal theories the United States intends to rely on for admitting the statements.

asserts, *see United States v. Rodriguez-Lopez*, 565 F.3d 312, 314-15 (6th Cir. 2009).  For example, in a consensually recorded conversation, Spivak described Scott and Church as "his own brother[s]" and indicates that is why they are "holding on to the corporate, free-trading stock."  This statement would not necessarily be offered to prove the truth of what it asserts, *i.e.* that Church and Scott are Spivak's brothers and in fact control all the free-trading USLG stock, but rather to show the close relationship and trust among Spivak, Scott, and Church.

Likewise, statements introduced to prove their falsity, rather than the truth of what they assert, do not implicate the rule against hearsay or the Confrontation Clause.  *See United States v. Porter*, 886 F.3d 562, 566-67 (6th Cir. 2018).  Statements that consist solely of questions or commands also are not hearsay because they do not contain assertions.  *See Rodriguez-Lopez*, 565 F.3d at 314.  And other statements—including those of victim-investors, UCEs, and the CHS—will be admissible to provide context to defendants' statements in the case.  *See United States v. Henderson*, 626 F.3d 326 (6th Cir. 2010) (holding that a non-party's half of a conversation with defendant was not hearsay, because it was admissible as context for defendant's half).

Finally, many of the Defendants' out-of-court statements qualify as verbal acts—such as when Spivak instructed the CHS to create a consulting agreement and told the CHS what language to use in the consulting agreement—that are not subject to the hearsay rule.  "A verbal act is an utterance of an operative fact that gives rise to legal consequences."  5 Weinstein's Federal Evidence § 801.11(3).  For verbal acts, "[i]t is the fact that the declaration was made, and not the truth of the declaration, which is relevant."  *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008).  Thus, where a statement directs the formation and operation of a conspiracy or illegally solicits someone else to perform an act, that statement is not barred by the hearsay rules,

regardless of the truth or falsity of its assertion.  *Cf. United States v. Forfana*, 543 F. App'x 578, 580 (6th Cir. 2013) ("words used to offer a bribe amount to 'verbal acts' with their own legal significance and do not qualify as hearsay").

Likewise, contracts and other agreements are "verbal acts" that are not hearsay under Rule 801.  *See United States v. Cardascia*, 951 F.2d 474, 486-87 (2d Cir. 1991); *see also Liani v. Baker*, No. 09-CV-2651, 2010 WL 2653392, at *6 n.11 (E.D.N.Y. June 28, 2010) ("[L]egally operative statements are not hearsay under Rule 801."); *Porter v. United States*, No. 13-CV-7332, 2015 WL 1004953, at *1 n.2 (S.D.N.Y. Mar. 3, 2015) ("[A] contract is 'a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay.'") (quoting *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992)); *see also Rancho Mountain Props., Inc. v. Gray*, No. 11–CV–0358, 2012 WL 1192755, at *4 (S.D. Cal. Apr. 9, 2012) (holding that loan documents are "verbal acts" and "therefore need not fall under an exception to hearsay in order to be admitted into evidence"); *Ryan v. State*, No. 91-CV-3725, 1999 WL 59982, at *3 (N.D. Ill. Feb. 3, 1999) ("Nor is the loan agreement hearsay—it is a contract with legal significance independent of the truth of any statement in it."); *In re Higadera*, No. 11–11315 T13, 2012 WL 5828624, at *6 (Bankr. D.N.M. Nov. 16, 2012) ("The key loan and/or loan purchase documents are not hearsay, but constitute acts of independent legal significance.").

Therefore, the fact that Spivak directed the CHS to create a false consulting agreement— not the truth of the document's contents itself—makes Spivak's statements and the resultant consulting agreement admissible.

### B.   STATEMENTS BY A PARTY OPPONENT

Each Defendant's own statements are admissible against him or her personally under Federal Rule of Evidence 801(d)(2)(A) as statements made by a party opponent.  Fed. R. Evid. 801(d)(2)(A); *United States v. Matlock*, 415 U.S. 164, 172 (1974).  Other statements may qualify

as adoptive admissions under Rule 801(d)(2)(B) if one or more of the defendants "manifested an adoption or belief in the statements' truth." *See United States v. Williams*, 445 F.3d 724, 735 (4th Cir. 2006); *United States v. Safavian*, 435 F. Supp. 2d 36, 43-44 (D.D.C. 2006) (ruling that emails authored by defendant may be admissible as statements by a party opponent, and emails forwarded by defendant may be admissible as adoptive admissions).  In this regard, many of the Defendants' statements contained in the emails, text messages, and recorded conversations will be admissible directly against a defendant or by that defendant's adoption of such statement.

C.    STATEMENTS BY A PARTY'S EMPLOYEE

The government will introduce statements that are admissible as non-hearsay statements of a party employee—here, those of USLG employees Laura Loesch and Maria Daniel and Intellitronix employees Anthony Corpora and Steve Eisenberg.  Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay when it is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.  Regarding USLG employee Loesch, who worked in accounting, the government intends to introduce Loesch's text messages with Defendants Spivak and Smirnova, co-conspirators, and other individuals, in which Loesch discusses USLG shares, commissions, and financial transactions.  Regarding USLG employee Daniel, who worked in investor relations, the government intends to introduce Daniel's statements on various recorded calls between February and June 2021 among Spivak, Smirnova, CHS, and/or the UCEs.  All of these statements were made during and within the scope of Loesch and Daniel's employment at USLG and are thus admissible as statements by a party agent or employee under Federal Rule of Evidence 801(d)(2)(D).

Similarly, the United States intends to introduce statements against Spivak of Intellitronix employees Corpora and Eisenberg (identified in the Second Superseding Indictment as

Employee-1 and Employee-2, respectively).  Specifically, during recorded calls on June 21 and

June 22, 2021, among Spivak, Smirnova, Employee-1, and Employee-2, Spivak and Smirnova

pressured Employee-1 and Employee-2, in their supervisory and employment capacities vis-à-vis

the witness, to pressure the witness to indicate that Spivak did not leave the bag of dead rodents

on the witness's porch.  Employee-1 and Employee-2's statements in response to Spivak and

Smirnova's requests are thus admissible as statements by a party agent or employee under Rule

801(d)(2)(D).

### D.  COCONSPIRATOR STATEMENTS

Many of the Defendants' statements, including the bulk of the text messages, phone calls,

and recorded conversations that the United States intends to offer, are admissible as

coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).  Under that rule, an out-

of-court statement is not hearsay if it "was made by the party's coconspirator during and in

furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  The proponent must show by a

preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant against whom the

statement is offered was a member of the conspiracy; and (3) the statement was made during and

in furtherance of the conspiracy.  *See United States v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978).

The court may consider the underlying statements themselves in determining whether this

hearsay exception applies.  *See Bourjilay v. United States*, 483 U.S. 171, 176-81 (1987).  The

court may also conditionally admit coconspirator statements subject to a later determination of

their admissibility.  *See Enright*, 579 F.2d at 983-87; *see also United States v. Kone*, 307 F.3d

430, 440 (6th Cir. 2002).  The coconspirator hearsay exception does not depend on whether the

government specifically charged the conspiracy or the involved coconspirators.  *See United

States v. Franklin*, 415 F.3d 537 (6th Cir. 2005).

A statement is "in furtherance of the conspiracy" if it was intended to promote the objectives of the conspiracy.  *United States v Monus*, 128 F.3d 376, 392 (6th Cir. 1997). Statements made "in furtherance of the conspiracy" can take many forms, such as keeping coconspirators advised or concealing aspects of the scheme.  *See United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000).  The statement may also "be susceptible of alternative interpretations."  *Id.*  Indeed, there is no requirement that the coconspirator's statement be "exclusively, or even primarily, made to further the conspiracy."  *See id.* (quoting *United States v. Doerr*, 886 F.2d 944, 951-52 (7th Cir. 1989).

The Sixth Circuit has held that the following types of statements qualify as being "in furtherance of the conspiracy": statements that keep coconspirators apprised of others' activities, *see United States v. Kelsor*, 665 F.3d 684, 694 (6th Cir. 2011); statements that allay the fears of other coconspirators, *see Monus*, 128 F.3d at 392-93; statements that "prompt a listener to act in a manner that facilitates the carrying out of the conspiracy," *see United States v. Jerkins*, 871 F.2d 598, 606 (6th Cir. 1989); statements made the day after a truck robbery was completed that explained what happened, who participated, how the stolen money would be distributed, and warned the coconspirator not to get caught, *see Franklin*, 415 F.3d at 551-53; conversations designed to collect money, *see United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982); statements made to potential recruits to solicit their participation, *see United States v. Holloway*, 740 F.2d 1373, 1376 (6th Cir. 1984); and statements that "identify participants and their roles in the conspiracy," *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994).  As such, Defendants' conversations with each other and with the UCEs and CHS—in addition to being their own party admissions—are also admissible as coconspirator statements against one another.

## IV.   THE GOVERNMENT MAY INTRODUCE EVIDENCE THAT POST-DATES THE COUNT 1 CONSPIRACY.

In its case-in-chief, the government intends to introduce limited evidence that post-dates the timeframe of the conspiracy alleged in Count 1 of the Second Superseding Indictment (and the related substantive securities and wire fraud counts), which the government alleges took place between 2016 and 2019.  Such evidence includes the following:

| Ex. # | Exhibit Name | Date | Time / Time stamp | Summary |
|---|---|---|---|---|
| 425 | Tuesday, February 16, 2021 1D24 Paul Spivak Olga Smirnova | 2/16/2021 | 36:36-46:28 | Paul Spivak tells Jason Dean that he does not work with "professional day trader types" but instead "professional pumper and dumpers." |
| 429 | Friday, March 5, 2021 1D32 Paul Spivak Olga Smirnova Maria Daniel | 3/5/2021 | 9:50-12:58, 13:30-17:20 | Paul Spivak explains to Jason Dean that two "very trusted guys" held about three million USLG shares each and "the plan is once a stock takes off, they're gonna sell it off and buy more off the company."  In describing Richard Mallion, Spivak stated: "Put Chris Farley in Wolf of Wall Street, you'd have the guy that took us public." |
| 431 | Monday, March 15, 2021 1D34 Paul Spivak Forrest Church | 3/15/2021 | 5:06-6:09 | Forrest Church explains to Jason Dean that he did not believe in putting things in writing and Paul Spivak therefore found Church to be trustworthy. |
| 432 | Tuesday, March 16, 2021 1D35 Paul Spivak Charlie Scott | 3/16/2021 | 1:19-3:12 | Paul Spivak explains to Jason Dean that Charles Scott and Forrest Church were "holding on to" USLG's stock "for [Spivak]," and Spivak |

| Ex. # | Exhibit Name | Date | Time / Time stamp | Summary |
|---|---|---|---|---|
| | | | | instructed Scott and Church to "forget about the stock until the audits are done and posted." |
| 434 | Wednesday, March 24, 2021 1D36 Maria Daniel Paul Spivak Forrest Church | 3/24/2021 | 0:31-0:41, 7:47-8:28, 8:54-10:15 | Forrest Church explains to Jason Dean how "the original deal" was for Charles Scott and Church to recoup the money they used to purchase the stock but they "can't do that 'cause Paul wants money." |
| 435 | Tuesday, March 30, 2021 1D27 Paul Spivak | 3/30/2021 | 14:24-15:38 | Paul Spivak tells Jason Dean that Forrest Church and Charles Scott are "gonna do whatever I say" and "they're very trusted" so "that's why they're holding onto the stock." Spivak explains that "when we bought the deal, remember I didn't know what I was doing, but I didn't know nothing about nothing," which is why he needed to put the stock in "friendly hands." |
| 437 | Tuesday, April 13, 2021 1D38 Paul Spivak Charlie Scott | 4/13/2021 | 6:59-7:32 | Paul Spivak tells Jason Dean not to put anything in writing. |
| 439 | Friday, April 16, 2021 1D37 Paul Spivak Charlie Scott Maria Daniel | 4/16/2021 | 7:30-8:10 | Paul Spivak tells Jason Dean that he "cannot be involved in the free trading side of the company," "that's why it's with Charlie [Scott] and Forrest [Church]," and "as soon as [he's] involved that stock goes back into being restricted stock" and it loses all its value. |

| Ex. # | Exhibit Name | Date | Time / Time stamp | Summary |
|---|---|---|---|---|
| 447 | Tuesday, May 18, 2021 1D45 Paul Spivak | 5/18/2021 | 9:35-11:12 | Paul Spivak and Jason Dean step outside to have a conversation about the stock scheme, and Spivak directs Dean to leave his phone inside on the table. |
| 446 | Tuesday, May 18, 2021 1D44 Paul Spivak | 5/18/2021 | 50:50-1:04:30 | Paul Spivak and Jason Dean brainstorm how to draft a fraudulent consulting agreement and discuss preparing what to say if they were to get caught.  Spivak also directs Dean to call him via FaceTime if Dean needed to speak with him because otherwise someone could listen in to their conversation. |
| 454 | Wednesday, June 2, 2021 1D51, 1D52 | 6/2/2021 | 0:12-4:08; 7:42-9:17 | Paul Spivak, Olga Smirnova, and Jason Dean brainstorm how to draft a fraudulent consulting agreement and discuss how to break the kickback into separate payments without using a "mathematical formula." |
| 459 | Tuesday, June 8, 2021 1D56 Paul Spivak | 6/8/2021 | 16:55-18:50, 19:21-19:57 | Paul Spivak directs Jason Dean to back-date the fraudulent consulting agreement to June 2 and hide the consulting agreement because "if Matt fucking sees that we're both dead." |
| 503 | Call # 18 - 20210610 @ 14:00; Call To:4407597300; Dur:10 Min. 45 Sec.; Filename:1623348000_22 4_12_188_849.wav | 6/10/2021 | 14:00-24:45 | Paul Spivak instructs Olga Smirnova to erase "important information" off Spivak's computers |

| Ex. # | Exhibit Name | Date | Time / Time stamp | Summary |
|-------|--------------|------|-------------------|---------|
| 506 | Call # 22 - 20210610 @ 15:57; Call To:4404793818; Dur:05 Min. 19 Sec.; Filename:1623355076_25 2_12_246_578.wav | 6/10/2021 | 15:57 | Paul Spivak instructs Olga Smirnova to remove computers from the "Richard Mallion days" from Spivak's and Smirnova's home.  He uses the code word "guns" to refer to the computers. |
| 511 | Call #171 - 20210621 @ 17:20; Call To:4407597300; Dur:01 Min. 30 Sec.; Filename:1624310455_29 2_12_175_13.wav | 6/21/2021 | 17:20 | Spivak directed Employee-1 to call a witness and his supervisor to explain that he was being detained because of the witness' statement. Spivak also directed the employee to tell the witness to call the FBI to tell them Spivak was not responsible for the bag of rodents |
| 512 | Call #172 - 20210621 @ 17:30; Call To:4404793818; Dur:02 Min. 09 Sec.; Filename:1624311043_29 2_13_70_822.wav | 6/21/2021 | 17:30 | Spivak directed Employee-1 to call a witness and his supervisor and to tell them that "they need to call the FBI and tell them there was a mistake." |
| 517 | Call #177 - 20210621 @ 18:01; Call To:4407597300; Dur:01 Min. 18 Sec.; Filename:1624312877_27 6_13_167_728.wav | 6/21/2021 | 18:01 | Spivak directed Olga Smirnova to call a witness' supervisor to ". . . let her know what's going on. Because it's her employee that's doing this to me." Spivak went on to direct Smirnova to call the supervisor to "let her know that your husband can't get out of jail cause [the witness] told this to the FBI. Get her number, call her right now please." |
| 518 | Call #178 - 20210621 @ 18:16; Call To:4407597300; Dur:04 Min. 18 Sec.; | 6/21/2021 | 18:16 | Olga Smirnova told Paul Spivak that Employee-1 spoke to a witness and the supervisor. In response, |

| Ex. # | Exhibit Name | Date | Time / Time stamp | Summary |
|---|---|---|---|---|
| | Filename:1624313784_28 4_13_67_289.wav | | | Spivak said, "Okay but you need to bug them first thing tomorrow and have them call the FBI or call [Spivak's attorney] or whatever." Spivak asked Smirnova, "How do we get [the witness] to say, ah well, you know what to do. How do we get [the witness's] testimony so they can use it against them?" |
| 520 | Call #181 - 20210621 @ 20:31; Call To:4407597300; Dur:03 Min. 51 Sec.; Filename:1624321865_28 4_13_173_178.wav | 6/21/2021 | 18:49 | Paul Spivak directs Olga Smirnova to wake up early, run to the office, and have a witness sign an affidavit so he can "use that and then they'll look like a fool at the thing and then they'll have to let me out" of prison. |
| 521 | Call #182 - 20210621 @ 20:36; Call To:4404793818; Dur:01 Min. 21 Sec.; Filename:1624322178_28 4_13_171_68.wav | 6/21/2021 | 20:36 | Paul Spivak directs Anthony Corpora to obtain a notarized sworn statement from a witness saying Spivak was not responsible for the dead rodents for Spivak to use in court. |
| 523 | Call #183 - 20210621 @ 20:39; Call To:4407597300; Dur:01 Min. 46 Sec.; Filename:1624322367_28 4_13_69_453.wav | 6/21/2021 | 20:39 | Paul Spivak told Olga Smirnova that Anthony Corpora was calling the witness's employee to get them to help and then the following exchange took place |
| 524 | Call #184 - 20210621 @ 21:02; Call To:4404793818; Dur:02 Min. 35 Sec.; Filename:1624323775_27 3_13_151_296.wav | 6/21/2021 | 9:02 | Anthony Corpora reported to Paul Spivak about his conversation with a witness asking the witness to write an affidavit.  Spivak tells Corpora that the witness is |

| Ex. # | Exhibit Name | Date | Time / Time stamp | Summary |
|---|---|---|---|---|
| | | | | responsible for Spivak's daughter not having a father. |
| 525 | Call #185 - 20210621 @ 21:14; Call To:4407597300; Dur:01 Min. 36 Sec.; Filename:1624324453_273_12_72_242.wav | 6/21/2021 | 21:14 | Paul Spivak told Olga Smirnova to take their daughter to see a witness, put their daughter on the witness's lap, and tell the witness that if the witness did not make a statement to the court that their daughter would be without a father. |
| 526 | Call #186 - 20210622 @ 08:24; Call To:4407597300; Dur:03 Min. 27 Sec.; Filename:1624364673_284_12_193_797.wav | 6/22/2021 | 08:24 | Olga Smirnova tells Paul Spivak that Smirnova should not be speaking with witnesses or else she would go to jail, too. |
| 528 | Call #188 - 20210622 @ 08:42; Call To:4404793818; Dur:05 Min. 03 Sec.; Filename:1624365730_284_12_187_474.wav | 6/22/2021 | 8:42 | Anthony Corpora reports to Paul Spivak about his efforts to talk with witnesses and how the witness refused to sign an affidavit. |
| 530 | Call #221 - 20210623 @ 12:21; Call To:4404793818; Dur:02 Min. 47 Sec,; Filename: 1624465313_284_12_161_23.wav | 6/23/2021 | 12:21 | Spivak directed Anthony Corpora to talk to former employees of his and to talk to the witness' employees and to let them know why Spivak was detained. When Corpora asked Spivak what the point of that would be since they already know about the rodent incident, Spivak explained that the witness would not help him and his former employees, now the witness' employees, if they had any "feelings toward their old captain of the ship, they |

| Ex. # | Exhibit Name | Date | Time / Time stamp | Summary |
|---|---|---|---|---|
| | | | | ought to get together and talk to the new captain of the ship." |
| 531 | Call #222 - 20210623 @ 12:41; Call To: 4407597300; Dur:02 Min.19 Sec.; Filename: 1624466495_287_12_182 _656.wav | 6/23/2021 | 12:41 | Olga Smirnova explained to Spivak that efforts to secure Spivak's release should be directed by his attorney, not Spivak. In response, Spivak said "it don't work like that" and that he had everything under control. When Smirnova warned him that he does not want to be seen as influencing anyone, Spivak said he was not and would never do anything like that. |
| 532 | Call #228 - 20210623 @ 13:59; Call To: 4404793818; Dur:02 Min.45 Sec.; Filename: 1624471155_292_12_191 _30.wav | 6/23/2021 | 1:59 | Paul Spivak told an employee that he and another employee needed to start calling "very loyal shareholders" for their help. After naming a number of shareholders, Spivak told the employee to explain to them that this was all because of Richard Mallion—that they would understand. He went on to say that the employee needed to start thinking about all of the "loyal shareholders that aren't going to say, 'oh boy, I'm in trouble, I'm dumping my stock and suing you guys.'" |

As detailed below, this evidence is admissible under one or more independent theories.

First, the evidence constitutes *res gestae* evidence because the conversations among the co-

conspirators—in which they discuss both the securities fraud at issue in Count 1 of the Second Superseding Indictment and planning for future, similar schemes—were made in furtherance of the charged conspiracy and aimed at avoiding its detection.  Additionally, the evidence is admissible under Federal Rule of Evidence 404(b).  Consistent with Rule 404(b), this evidence tends to prove Defendants' intent, motive, plan, preparation, knowledge, an absence of mistake as it relates to the securities crimes charged in the Second Superseding Indictment.  And finally, certain of the evidence is admissible as consciousness of guilt evidence under either theory.

    A.    <u>THE EVIDENCE IS PROBATIVE OF DEFENDANTS' KNOWLEDGE AND INEXPLICABLY INTERTWINED WITH THE COUNT 1 CONSPIRACY.</u>

The recorded conversations between Defendants Spivak, Smirnova, CHS, and UCEs (and resulting documents created from those conversations) are not "bad acts" as contemplated by Rule 404(b), but rather go directly to the Defendants' knowledge of past securities fraud schemes.  In this regard, post-conspiracy statements, in which the Defendants discuss both the securities scheme at issue in Count 1 of the Second Superseding Indictment and planning for future, similar schemes—constitutes *res gestae* evidence because they were made in furtherance of the charged conspiracies and aimed at avoiding their detection.  *See United States v. Howard*, 770 F.2d 57, 60-61 (6th Cir. 1985) (holding that recorded conversations between conspirators in a conspiracy to obtain insurance proceeds from house fire were made in furtherance of conspiracy where conversations were at least partly designed to conceal the conspiracy, the insurance company's investigation into fire was still ongoing and the final disposition of proceeds was unresolved).  Indeed, at the time of the recordings, Spivak, Smirnova, and others were still capable of perpetuating the conspiracy and motivated to avoid its detection, and the

recordings thus demonstrate continuity of purpose and continued performance of the charged conspiracies.[2]  *United States v. Hamilton*, 689 F.2d 1262, 1268-70 (6th Cir. 1982).

Moreover, the charges in this case place the Defendants' intent at issue, and their recorded statements among one another serve as evidence of their knowledge, consciousness of guilt and participation in the conspiracy.  In this regard, the government is not bound by approximate start or end dates listed in the indictment; the scope of evidence introduced to establish the conspiracy may extend beyond an approximate date.  *See United States v. Mangual-Santiago*, 562 F.3d 411, 428 (1st Cir. 2009) (citing *United States v. Paredes-Rodriguez*, 160 F.3d 49, 56 (1st Cir. 1998)).  Evidence of actions which occurred after the conspiracy has ended may also be admissible.  *Id.* (citing *Lutwak v. United States*, 344 U.S. 604, 617 (1953)).

Here, many of the statements that the government intends to introduce from the recorded statements discuss the securities conspiracy at issue in Count 1 of the Second Superseding Indictment.  For example: On February 16, 2021, Spivak told CHS that during the previous scheme he executed to manipulate the stock, USLG's stock price went up to $1.50 per share. Spivak described his previous partner in that scheme as a "professional pump and dumper." Similarly, on March 15, 2021, Spivak explained to CHS that two "very trusted guys" held about three million USLG shares each and "the plan is once a stock takes off, they're gonna sell it off and buy more ff the company."  In describing this scheme, Spivak then referenced co-conspirator Mallion, stating: "Put Chris Farley in Wolf of Wall Street, you'd have the guy that took us

---

[2] This is true despite the CHS and UCEs' cooperation with the government: "[W]here, as here, the unarrested coconspirators are still capable of perpetuating the ongoing conspiracy, the statements made by them to the arrested conspirator are admissible for Rule 801(d)(2)(E) purposes, even when the arrested conspirator was acting under the direction and surveillance of government agents to obtain evidence against the coconspirators."  *See United States v. Emuegbunam*, 268 F.3d 377, 396 (6th Cir. 2001).

public." And again on June 2, 2021, Spivak referenced how he improved the kickback formula from the last time he committed a securities fraud scheme based on encounters he had with the SEC, tricks of the trade that he learned from the SEC about what not to do.

These statements evince Spivak and his co-conspirators' knowledge of and participation in the conspiracy charged in Count 1, while also discussing their ongoing planning for a similar securities scheme. It is thus difficult, if not impossible, to divorce the past discussions from the future plans—for example, the context of "another one" justifiably draws the inference that, whatever the parties are currently planning, this is not the first market manipulation scheme they have concocted. The recorded conversations and resulting documents thus are probative of the parties' relationship and respective roles in the charged conduct and are necessary to complete the story of the charged crimes. As such, they are admissible in the government's case-in-chief without resort to Federal Rule of Evidence 404(b).

B. ADDITIONALLY, THE PROFFERED EVIDENCE IS ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 404(B).

Additionally, the United States intends to introduce this evidence under Federal Rule of Evidence 404(b) as probative of Defendants' intent, motive, plan, preparation, knowledge, or absence of mistake as it relates to the securities and wire fraud crimes charged in the Second Superseding Indictment. Rule 404(b) sets forth a general prohibition on introducing "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). Such evidence may be admissible, however, for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* In determining the admissibility of other acts evidence under Rule 404(b), the court considers three factors: (1) whether there is sufficient evidence that the act(s) occurred;

(2) whether the other act(s) is admissible for one of the proper purposes under the rule; and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *United States v. Hardy*, 643 F.3d 143, 150 (6th Cir. 2011).

As an initial matter, there is sufficient evidence that the acts in question occurred to satisfy the first prong of this Court's inquiry. A representative of the FBI will testify to having heard firsthand Defendants' statements. The conversations between Defendants and their coconspirators were audio and video recorded, and the government intends to play the relevant portions of those conversations at trial. It will also introduce into evidence the physical documents that were prepared as a result of those conversations.

Having satisfied this showing, evidence of the Defendants' own statements about the charged conduct and discussions with coconspirators are highly probative of the Defendants' knowledge and intent. When a charged crime requires an element of specific intent—such as securities fraud, "other acts" evidence is generally admissible to show such intent. *See United States v. English*, 785 F.3d 1052, 1055-56 (6th Cir. 2015) (finding that defendant's involvement in prior Medicare fraud schemes was admissible under 404(b) to prove intent, knowledge and absence of mistake, where United States must prove that the defendant "willfully" defrauded Medicare); *see also United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994)). The government likewise may present other-acts evidence when it helps prove a defendant's "specific criminal intent," where such intent is imposed "by virtue of the defense raised by the defendant." *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994). And "absence of mistake is in issue where a defendant admits involvement in a specific event but asserts that he acted unwittingly or with honest intent." *United States v. Sandoval*, 460 F. App'x 552, 564-65 (6th Cir. 2012) (collecting cases).

33

Here, both the charges and known defenses place Defendants' knowledge and intent squarely in dispute.  Proof of securities fraud requires proof that the Defendants acted knowingly and willingly, whereas Defendants have argued good faith, mistake, honest belief in the success of the venture, and other defenses that implicate their state of mind.  As such, the recorded conversations—which illustrate, among other things: the nature of the Defendants' relationships vis-à-vis each other and their coconspirators; the conspirators' course of dealing; the development, knowledge, and execution of the unlawful relationship; and a pattern of criminal activity—implicate several permissible purposes under Rule 404(b).  *See, e.g., United States v. Encarnacion*, 26  F.4th 490, 506-08 (1st Cir. 2022) (admitting recorded calls between defendant and coconspirator about other, similar drug transactions that predated the charged drug conspiracy both as intrinsic to the conspiracy and, alternatively, as admissible under Rule 404(b); under Rule 404(b), the court concluded that the calls "were probative of the development of the charged conspiracy and of the nature of the working relationship between [the coconspirator] and the defendant"); *United States v. Gessa*, 971F.3d 1257, 1261-62 (6th Cir. 1992) (admitting evidence under Rule 404(b) that witnesses had accompanied defendant to obtain drugs on a smuggling expedition before charged drug conspiracy as probative of defendant's ability and opportunity to participate in smuggling scheme); *see also United States v. Fields*, 871 F.2d 188, 197 (1st Cir. 1989) ("Evidence of a conspirator's post conspiracy activity is admissible if probative of the existence of a conspiracy or the participation of an alleged conspirator, even though they might have occurred after the conspiracy ended.") (internal quotation omitted).

For example, in a recorded conversation on March 20, 2021, Spivak explained to CHS and a UCE why Scott and Church were holding on to USLG's free-trading stock:

Spivak:     Trustworthy people. That's why they're holding onto the stock. I could, you know, outta my 500 shareholders, you know, because if, if we

> would've taken the stock, it would've went back into treasury stock and be restricted.

CHS:   Mm-Hmm. &lt;affirmative&gt;.

Spivak:  So when we bought the deal, remember I didn't know what I was doing, but I didn't know nothing about nothing.

These statements directly parallel Spivak's fraudulent activity in the 2016 through 2019 timeframe, *i.e.* concealing Spivak's beneficial ownership in free-trading USLG stock through the use of nominees.  In this regard, they statements are highly probative of Spivak's knowledge, intent, and lack of mistake.  First, the statements show that Spivak knows the difference between restricted and free-trading shares.  Second, they demonstrate Spivak's intent to keep the shares with nominees so that they do not revert back to treasury stock.  And third, they are probative of whether Spivak's placement of the free-trading shares with Scott and Church during the 2018-2019 time period was not a mistake.  As such, these and similar statements admissible under Rule 404(b) for a proper purpose, *i.e.* to establish intent, motive, plan, preparation, knowledge, or absence of mistake.

Finally, the probative value of the recordings and documents is not substantially outweighed by any undue prejudice.  Apart from their obvious relevance to Defendants' prior securities crimes and their planning for future, similar crimes, there is nothing particularly salacious or inflammatory about the Defendants' conversations.  And while the Defendants may not like the introduction of these statements, not all evidence that "paints [a] defendant in a bad light is [] unfairly prejudicial."  *United States v. Blanchard*, 618 F.3d 562, 569 (6th Cir. 2010).  If the Court admits the recordings under a 404(b) theory (as opposed to a *res gestae*) theory, the government requests that the Court provide the Sixth Circuit Pattern Instruction 2.09, which

limits the scope and potential prejudicial effect of the government's evidence to a proper Rule 404(b) purpose.

    C.    <u>EVIDENCE OF SPIVAK'S EFFORTS TO DELETE EVIDENCE AND TAMPER WITH WITNESSES IS ADMISSIBLE CONSCIOUSNESS-OF-GUILT EVIDENCE.</u>

As set forth above, one category of post-conspiracy evidence that the government plans to introduce is evidence of Spivak's efforts to tamper with witnesses and delete evidence. Whether simply under Rule 401 or through Rule 404(b), the Sixth Circuit overwhelmingly upholds the admission of this type of evidence as probative of a defendant's consciousness of guilt.

The Sixth Circuit has routinely upheld the admissibility of spoilation evidence to establish a defendant's consciousness of guilt. *United States v. Cordero*, 973 F.3d 603, 620-21 (6th Cir. 2020) ("We have repeatedly ruled that spoliation evidence is highly probative and not sufficiently inflammatory to warrant exclusion under Rule 403."). "Spoilation evidence" includes evidence that a defendant attempted to bribe and threaten a witness. *United States v. Mendez-Ortiz*, 801 F.2d 76, 79 (6th Cir. 1986) (collecting cases); *see also United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004); *United States v. Bright*, 630 F.2d 804, 821 (5th Cir. 1980) (evidence that defendant asked a witness to change his testimony before trial was admissible as consciousness of guilt). It also includes evidence that a defendant destroyed incriminatory evidence or fabricated exculpatory evidence. *United States v. Clark*, 24 F.4th 565, 580 (6th Cir. 2022).

Spoilation evidence "tends to establish consciousness of guilt without any inference as to the character of the spoliator." *United States v. Smith*, 139 F. App'x 681, 686 (6th Cir. 2005) (quoting *Mendez-Ortiz*, 801 F.2d at 79); *see also United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993) ("[E]vidence that has the tendency to demonstrate a defendant's consciousness of

wrongdoing is admissible to establish the defendant's guilt."). "The fact that [a] defendant attempted to [spoil evidence] indicates 'his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.'" *Mendez-Ortiz*, 810 F.2d at 79 (quoting II Wigmore, Evidence § 278).  Consciousness of guilt evidence is further probative of intent, knowledge, and lack of mistake, all of which are permissible purposes under Rule 404(b).  *See Cordero*, 973 F.3d at 620.  As such, the admission of spoliation evidence does not violate Rule 404(b).  *Mendez-Ortiz*, 801 F.2d at 79.

The Sixth Circuit's decision in *United States v. Poulsen*, 655 F.3d 492, 508-09 (6th Cir. 2011), is instructive.  In *Poulsen*, the Sixth Circuit affirmed the district court's ruling that evidence of a defendant's witness tampering, during his trial for obstruction of justice, was admissible other acts evidence at defendant's separate trial on securities fraud charge.  655 F.3d at 508-09.  The Court reasoned that the evidence was not offered to prove defendant's character in conformity with the prior bad act but, rather, was offered as evidence of his consciousness of guilt.  *Id.*  It further rejected Poulsen's argument that the evidence was prejudicial because it suggested his consciousness of guilt, quoting the district court's conclusion that "'the probative value of a defendant's spoliation attempt is precisely that it indicates consciousness of guilt. Thus, 'any inference that Poulsen's attempt to bribe [the witness] evidences a guilty conscience is not unfair prejudice.'" *Id.* at 509.

Here, the government's recorded conversations plainly capture Spivak's spoliation efforts and are admissible to prove his consciousness of guilt.  Regarding Spivak's efforts to delete evidence, Spivak instructed Smirnova in a recorded jail call on June 10, 2021, to remove computers from Spivak and Smirnova's home, telling her in the process that he was "worried about Richard Mallion stuff."  In a separate jail call that same day, Spivak told Smirnova that the

FBI wanted to seize computers and to erase "important information" from Spivak's computers. Regarding Spivak's witness tampering efforts, the government's recordings again demonstrate that Spivak attempted to influence Smirnova to have a witness sign an affidavit falsely claiming that Spivak was not involved in leaving a bag of dead rodents on the witness's porch.  For example, Spivak instructed Smirnova in a recorded jail call on June 21, 2021:

> Listen.  If you want to see me anytime soon, you gotta wake up early in the morning, run over to work, get [the witness] to sign a sworn affidavit that there was no way because I don't know where [the witness] lives, I've only known [the witness] for 2 weeks and [the witness] don't know sh*t, and get it to [Spivak's attorney] and he can use that and then they'll look like a fool at the thing and then they'll have to let me out.

Later that day, in another recorded jail call, Spivak likewise urged Employee-2 to solicit one of the witness's employees to help secure an affidavit from the witness.

These and other similar recordings that evidence Spivak's blatant spoliation efforts bear on Spivak's "consciousness that his case is a weak or unfounded one." *Mendez-Ortiz*, 810 F.2d at 79.  Spivak's spoliation attempts are probative of a guilty conscience and go directly to his knowledge, intent, and lack of mistake regarding the securities fraud crimes charged.  Given the substantial relevance of this evidence vis-à-vis Spivak's intent, Spivak cannot establish any undue prejudice—let alone undue prejudice that substantially outweighs this strong probative value.  Accordingly, consistent with the Sixth Circuit's time-worn precedent, Spivak's efforts to delete evidence and tamper with a witness are admissible evidence in relation to the Count 1 and 2 conspiracies (and related substantive counts).

### D. THE GOVERNMENT'S DISCLOSURE WAS TIMELY.

As a final matter, Defendants complain that the government failed to give them timely formal notice of its intent to use this evidence under Rule 404(b).  But Defendants' complaint falls flat.  The notice requirement may take many forms, including disclosure of the other act evidence in discovery.  *United States v. Green*, 275 F.3d 694, 701-02 (8th Cir. 2001) (finding

that the government gave notice of its intent to use 404(b) evidence by providing defense counsel

the documents upon which the other acts were based, arrest records, four months before trial).

As the Eighth Circuit explained:

Rule 404(b)'s notice standard is flexible because "[w]hat constitutes a reasonable ... disclosure will depend largely on the circumstances of each case." *United States v. Green*, 275 F.3d 694, 701 (8th Cir.2001). The notice rule is intended to "reduce surprise and promote early resolution on the issue of admissibility." *United States v. Robinson*, 110 F.3d 1320, 1326 (8th Cir.1997). It prevents the Government from "[lying] in wait and spr[inging] the 'other acts' evidence" on an unsuspecting defendant. *United States v. Vega*, 188 F.3d 1150, 1155 (9th Cir.1999). Whether notice was reasonable is informed in part by a defendant's proof that he suffered prejudice as a result. *Id.*

*United States v. White*, 816 F.3d 976, 984 (8th Cir. 2016); *see also United States v. Watson*,

409 F.3d 458, 465 (D.C. Cir. 2005) (upholding admission of Rule 404(b) evidence despite late

notice in part because the defendant failed to demonstrate prejudice as a result of the error).

Here, the government provided the 404(b) evidence it intends to introduce in its various

discovery productions to the defendants, which itself is sufficient notice of the government's

intent to use it.  *See Green*, 275 F.3d at 701-02.  Moreover, the government has repeatedly

confirmed its intent to use the various types of 404(b) evidence described herein (*see, e.g.*,

R. 305: USA Omnibus Resp. in Opp'n (SEALED), PageID 2831-34); the government and

defense referred to the evidence in argument (*see, e.g.*, R. 319: Mots. Hr'g Tr, PageID 3124-25,

3095-99); and by marking them as exhibits and providing the list to defense counsel before

trial.  Indeed, Defendants objected to this evidence in their own Motion in Limine (R. 382), thus

confirming their awareness of the government's intent to introduce the 404(b) evidence.

At bottom, the government timely disclosed its intent to use the post-conspiracy evidence

under Rule 404(b).  *See United States v. French*, 974 F.2d 687, 695 (6th Cir. 1992) (holding that

disclosure one week before trial provided "ample opportunity . . . to prepare for the

consequences of this damaging evidence.").  And Defendants cannot establish any prejudice from the timing of the government's disclosure.

## V.  THE GOVERNMENT MAY CHOOSE WHICH PORTIONS OF DEFENDANTS' STATEMENTS TO ADMIT.

As set forth above, the United States intends to introduce numerous recorded conversations of the Defendants, whether through emails, text messages, jail calls, or consensually recorded conversations.   The government is permitted to introduce only the portions of Defendants' statements that are relevant and admissible under an applicable hearsay exception (*e.g.,* admissions or coconspirator statements), and redact the remaining portions of the statement that are exculpatory.  *See United States v. Gallagher*, 57 F. App'x 622, 626 (6th Cir. 2003) (court upheld parsing of defendant's statement to exclude self-serving exculpatory portions that related to defendant's entrapment defense).  It is well-settled that defendants cannot seek to introduce their own self-serving exculpatory statements.  *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (citing *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996), *cert. denied*, 522 U.S. 934 (1997)).  While the Federal Rules of Evidence allow the government to introduce inculpatory statements made by a defendant, the "Rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *Id.*  Thus, while the government is permitted to introduce some or all of a defendant's statements against him as non-hearsay admissions of a party-opponent under Rule 801(d)(2), a defendant is not permitted to introduce his own statements under the same Rule.  This rule applies equally to the evidence the defendant seeks to introduce in his own case as it does to the evidence he tries to elicit through the cross-examination of witnesses.

Moreover, the "rule of completeness" under Federal Rule of Evidence 106 does not prohibit the government from introducing only portions of communications sent among the Defendants. The rule of completeness "allows a party who is prejudiced by an opponent's introduction of part of a document, or a correspondence, or a conversation, to enter so much of the remainder as necessary to explain or rebut a misleading impression caused by the incomplete character of that evidence." *United States v. Crosgrove*, 637 F.3d 646, 661 (6th Cir. 2011). But the rule of completeness "does not make inadmissible evidence admissible." *Id.*; *see also Gallagher*, 57 F. App'x at 628-29 (quoting *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 718 (6th Cir. 1999)). It likewise does not override the prohibition on admitting self-serving, exculpatory statements. *Id.* The court in *Crosgrove* found that because the messages that the defendant sought to admit were not "necessary to correct a misleading impression," the district court did not err in excluding some of the messages. In the present case, admission of some of the communications sent among Defendants will not create a misleading impression for either of the Defendants. Therefore, the United States should not be required to introduce the entire scope of conversations if they are irrelevant or self-servingly exculpatory at trial.

## VI. DEFENDANTS' EVIDENCE AND DEFENSES MUST BE RELEVANT.

Defendants may not present evidence or argument related to any irrelevant defenses. "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). Federal Rule of Evidence 402 provides that only relevant evidence is admissible at trial. Federal Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make a fact [that is of consequence in determining the action] more or less probable than it would be without the evidence." The Supreme Court explained: "[r]elevancy is not an inherent characteristic of any

41

item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (citing Advisory Comm. Notes of Fed. R. Evid. 401).  In analyzing the relevance of a piece of evidence, courts consider (1) whether the evidence tends to prove the proposition it is offered to prove and (2) whether that matter is "of consequence to the determination of the action." *United States v. Waldrip*, 981 F.2d 799, 806-07 (5th Cir. 1993).

Relevant evidence, however, is not always admissible.  Rule 403 of the Federal Rules of Evidence gives the Court discretion to exclude evidence, even if relevant, "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." A trial court's determinations as to the admissibility or relevance of evidence "depend on the exercise of sound judgment within the context of the entire trial." *United States v. Bilderbeck*, 163 F.3d 97, 978 (6th Cir. 1999) (trial court's ruling *in limine* to limit cross-examination about cooperator's likely prison term not an abuse of discretion where it appeared such testimony would be used to compare to defendant's own likely term of incarceration) (citing *United States v. Seago*, 930 F.2d 482, 494 (6th Cir. 2991)).

Citing these rules, the Sixth Circuit has repeatedly upheld the exclusion of irrelevant defenses.  *See e.g., United States v. Hart*, 70 F.3d 854, 858 (6th Cir. 1995) (upholding limitation on cross examination of government witness regarding past manipulation of government agents in an unrelated matter); *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 2994) (upholding trial court's decision to exclude defense evidence that the government investigation was sloppy); and *United States v. Poindexter*, 942 F.2d 354, 362 (6th Cir. 1991) (trial court's exclusion of self-defense evidence upheld in prosecution for carrying a weapon during commission of a drug

trafficking crime); *see also United States v. McElroy*, 910 F.2d 1016, 1024-25 (2d Cir. 1990)

(upholding district court's exclusion of defense that the victim, a bank, was not injured in bank

fraud prosecution); *United States v. Fierros*, 692 F.2d 1291, 1294 (9th Cir. 1982) (upholding

district court's exclusion of evidence that defendant knew his actions violated the statute).

Based on the facts of this case as well as discussions with counsel, the United States

foresees several types of irrelevant defenses that the Defendants may try to raise or suggest the

following defenses.  But as set forth below, these defenses would be irrelevant, and the Court

should preclude Defendants from presenting any argument or evidence related to them.

A.     THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT
       REGARDING ANY PURPORTED BELIEF OF "NO ULTIMATE HARM" TO
       INVESTORS.

Defendants should not be permitted to elicit evidence or argue to the jury that they lacked

intent to defraud because they had a good faith belief that USLG ultimately would be profitable.

A defendant's good faith belief in the possibility of a venture's profits does not equate to good

faith regarding their representations to investors and potential investors.  Indeed, the "well

intentioned belief that a business venture in which a defendant was involved would be successful

and would allow for repayment of money taken from victims does not supply a basis for a

defense that there was a good faith belief that a representation was true." *United States v. Okun*,

Cr. No. 08-132, 2009 WL 414009 (E.D. Va. Feb. 18, 2009) (citing *United States v. Godwin*,

272 F.3d 659, 666-67 (4th Cir. 2001)); *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y.

1997) ("The definition of good faith addresses the defendant's belief in the truth of the

representations, and not the defendant's belief as to the ultimate success of the plan.") (citing

Sand et al., *Modern Federal Jury Instructions*, Instruction 44-01 (2017 ed.)); *United States v.

Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) (finding that a guilty verdict on securities

fraud charges based on the fact that the defendant intentionally caused others to issue false or

misleading statements to investors would be proper regardless of evidence of the defendant's belief that his investment strategy would be successful financially).

In situations where a defendant has improperly presented evidence or argument of his or her good faith belief in the success of a scheme involving false statements to victims or investors, the Second Circuit has routinely upheld use of a "no ultimate harm" charge, which instructs the jury that "a belief of a defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith.  No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [the defendant]."  *United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) (finding that instruction in a securities fraud trial was appropriate where the defendants, who had defrauded investors in a movie by misleading those investors about how investment monies would be spent, had argued at trial that they had a good faith belief that the movie would be completed); *United States v. Shkreli*, 779 F. App'x 38, 40 (2d Cir. 2019) (holding that instruction in securities fraud and wire fraud trial was appropriate where defendant argued that "that despite his many misrepresentations and omissions to" investors, "he did not have the requisite intent to defraud those investors because he believed that the investors would ultimately make money from their investments"); *United States v. Levis*, Cr. No. 10-4819, 2012 WL 2914118, at *3 (2d Cir. Jul. 18, 2012) (finding that instruction was appropriate where the defendant, who had made misrepresentations regarding the independent valuation of his company to investors, had argued at trial that he did not believe any harm would befall investors).

Here, Defendants' belief in the value of USLG's LED lightbulbs, recreational vehicles, robots, or other development projects—and the concomitant likelihood that investments in

USLG could ultimately be profitable—has no bearing on whether they engaged in the charged fraud scheme by, *inter alia*, concealing Spivak's beneficial ownership in free-trading shares, failing to disclose that unregistered brokers received commissions upwards of 50% per investment, lying to investors about the anticipated use of proceeds, concealing the misappropriation of such proceeds, and misrepresenting the status of USLG's performance.  Any purported belief that USLG would ultimately turn a profit for investors has no bearing on whether the defendants made these misrepresentations and omissions to investors.  The Court should therefore preclude evidence and argument concerning the purported value of USLG's assets and any purported belief of the defendants that investors would ultimately profit.  This evidence is irrelevant to whether the defendants lied to investors and would serve only to confuse and distract the jury and invite nullification.

      B.    <u>THE COURT SHOULD PRECLUDE ARGUMENT THAT THE VICTIM-INVESTORS WERE "UNREASONABLE VICTIMS" OR THAT OTHERWISE BLAMES THE VICTIMS.</u>

Relatedly, the United States anticipates that defense counsel may use the "unreasonable victim" defense.  The United States understands the "unreasonable victim" defense as any defense theory, regardless of how presented, that places some or all responsibility for defendants' charged conduct on the victim.  The government would expect such a defense to manifest itself through cross-examination questions of government witnesses or in opening or closing statements, specifically focusing on the fact that the victim-investors in USLG represented themselves as "accredited" investors for purposes of SEC regulations, which classification generally ascribes some degree of wealth and/or financial sophistication for the investor.  As set forth below, the Defendants should be precluded from presenting the "unreasonable victim" theory as a defense at trial.

Because the government's burden is to demonstrate that a defendant's scheme or misrepresentation was reasonably calculated to deceive persons of ordinary prudence and comprehension, it is improper for a defendant to argue or suggest that the victim bears some degree of culpability for the commission of the offense. The Sixth Circuit has recognized that "[a] scheme to defraud . . . 'must involve misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Bohn*, 281 F. App'x 430, 440-41 (6th Cir. 2008) (quoting *United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir. 2005); *Berent v. Kemper Corp.*, 973 F.2d 1291, 1294 (6th Cir. 1992)). The *Bohn* court went on: "[t]o be actionable, the misrepresentations must merely be 'worthy of reliance or credence.' This is not an exacting standard. As we noted in *Jamieson*, the purpose of the 'prudence and comprehension' requirement is to ensure that the scheme was 'at least minimally credible.'" *Id.* (internal citation omitted) (citing *Jamieson*, 427 F.3d at 415).

The Second Circuit has also recognized that "the ordinary prudence standard therefore focuses on the violator, not the victim." *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004). In *Thomas*, the trial court properly barred the defense from cross-examining the victim regarding the "lack of caution he exercised during the fraud" and also declined "in instructing the jury in this regard." *Id.* at 240. The Second Circuit further held that "[t]he 'unreasonable victim' argument misapprehends the function of the ordinary prudence standard." *Id.* at 242. In rejecting the notion that "the legality of a defendant's conduct depend[s] on his fortuitous choice of a gullible victim,' the *Thomas* court recognized that "[m]ost circuits that apply the ordinary prudence and comprehension standard have already rejected some form of the 'unreasonable victim' argument." *Id.*, 377 F.3d at 243-44 (citing *United States v. Benson*, 548 F.2d 42, 46 (2d Cir. 1977) and quoting *United States v. Pollack*, 534 F.2d 964, 971 (D.C. Cir. 1976).

Defendants thus should be precluded from blaming the investor-victims investing in USLG or otherwise suggesting that they somehow invited or deserved the Defendants' theft of the money.  To allow otherwise would impermissibly shift the focus away from Defendants' false representations and improperly blame the victims for not having prevented Defendants' fraud in the first place—which is clearly not their obligation.

C.     THE COURT SHOULD PRECLUDE DEFENDANTS FROM INTRODUCING PRIOR GOOD ACTS.

Defendants may seek to introduce testimony and other evidence that some of the individuals solicited to invest in USLG were happy with their investments.  Defendants may attempt to offer this evidence affirmatively, but also may attempt to infer that such evidence exists by questions posed during cross-examination.  Any evidence or references during questioning to Defendants' previous "good acts" with investors should not be permitted because (i) it is prohibited by Federal Rules of Evidence 404(b) and 405 and (ii) it is prohibited by Federal Rules of Evidence 401, 402, and 403 because it is irrelevant to the offenses charged in the Indictment and risks unnecessarily confusing the jury.

1.     Federal Rules of Evidence 404(b) and 405 bar the admission of character evidence in the form of Defendants' prior "good acts."

The Court should prevent Defendants from introducing evidence that some of their patients were happy with the services that they received because such "reverse 404(b)" evidence is precluded by the Federal Rules of Evidence.  Although Rule 404(b) is most commonly invoked by defendants to prevent the prosecution from introducing improper propensity evidence inculpating the defendant, the Sixth Circuit Court of Appeals has consistently held that the same standard applies when defendants use "reverse 404(b)" propensity evidence to exculpate themselves. *United States v. Lucas*, 357 F.3d 599, 605 (6th Cir. 2004).  Despite its recognition that the primary evil of 404(b) evidence, risk of prejudice to defendants by impugning their

47

character, is not present with "reverse 404(b)" evidence, the Sixth Circuit has rejected the argument that Rule 404(b) is completely inapplicable.  *Id.*  Relying on the language of the rule and the Advisory Committee Notes, it has ruled that, regardless of its form, pure propensity evidence, albeit relevant, "nevertheless create[s] more prejudice and confusion than is justified by [its] probative value."  *Id.*; *see also United States v. Williams*, 458 F.3d 312, 317 (3d Cir. 2006) ("Although . . . a defendant is allowed more leeway in introducing *non-propensity evidence* under Rule 404(b), he or she is not allowed more leeway in introducing *propensity evidence* in violation of Rule 404(b).").  Thus, "[f]or the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes."  *United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014); *see also United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) (holding that defendants' good acts are irrelevant to their defense because "[e]vidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable.").

Evidence that some of USLG investors were satisfied with their investments or believed in Spivak and his coconspirators is impermissible because character is not an essential element of any of the crimes charged in the indictment.  Fed. R. Evid. 405(b); *see Silber*, 456 F. App'x at 562 (finding that character is not an essential element of a health care fraud charge).  The Indictment includes securities fraud, wire fraud, and conspiracy, but none of them allege that they engaged in the specified crime every single time they spoke with an investor.  *See United States v. Scarpa*, 913 F.2d 993, 1010 – 11 (2d Cir. 1990) ("evidence of their *noncriminal* activities . . . would only be relevant if the indictment charged them with ceaseless criminal conduct.").  Testimony from any investors who were happy with Defendants' stock sales or

believed in USLG on specific occasions is thus an impermissible attempt to prove character through specific acts and is barred by the Federal Rules of Evidence.  *See generally Gov't of the Virgin Islands v. Grant*, 775 F.2d 508, 511-12 (3d Cir. 1985) (holding that Rule 405(a) does not make an exception for accused persons seeking to prove their good character by specific acts). Therefore, the Court should prohibit Defendants from offering evidence about any "good acts" Defendants have committed.

Such evidence is also irrelevant.  None of the crimes alleged in the Second Superseding Indictment requires that each investor be unhappy with his or her interactions with Spivak, USLG, and the other co-conspirators for a jury to convict.  Whether an investor liked Spivak, Smirnova, or Scott does not make it any more or less probable that Defendants conspired to commit securities fraud and actually did so on the occasions specified in the Second Superseding Indictment.  Therefore, such testimony is excludable as irrelevant under Rule 401 of the Federal Rules of Evidence. And, even if the Court does find that the evidence may be relevant, it should still be excluded under Rule 403 since its probative value is minimal while its inclusion will substantially increase the risk of confusing the jury and distracting from the crimes charged.

2.    The Government Should Be Permitted to Rebut Defendants' Character Evidence.

Although Defendants should be barred from having investors testify about specific occasions on which they were happy about the treatment they received, Defendants may be permitted to have investors testify to their character in the form of opinion or reputation testimony.  Fed. R. Evid. 405(a).  To the extent the Court permits such evidence, the Government will introduce evidence to rebut assertions of good character.  "Once the defendant has 'opened the door' by offering evidence as to his good character, the prosecution may rebut that evidence."  *United States v. Clark*, 26 F. App'x 422, 427 (6th Cir. 2001) (citing *United States v.*

*McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984)).  The Supreme Court has long cautioned

defendants:

> The price a defendant must pay for attempting to prove his good name is
> to throw open the entire subject which the law has kept closed for his benefit and
> to make himself vulnerable where the law otherwise shields him.  The prosecution
> may pursue the inquiry with contradictory witnesses to show that damaging
> rumors, whether or not well-grounded, were afloat – for it is not the man that he
> is, but the name that he has which is put in issue.  Another hazard is that his own
> witness is subject to cross-examination as to the contents and extent of the
> hearsay on which he bases his conclusions, and he may be required to disclose
> rumors and reports that are current even if they do not affect his own conclusion.
> It may test the sufficiency of his knowledge by asking what stories were
> circulating concerning events, such as one's arrest, about which people normally
> comment and speculate.  Thus, while the law gives defendant the option to show
> as a fact that his reputation reflects a life and habit incompatible with commission
> of the offense charged, it subjects his proof to tests of credibility designed to
> prevent him from profiting by a mere parade of partisans.

*United States v. Michelson*, 335 U.S. 469, 479 (1948).

Thus, while Defendants are limited to opinion and reputation testimony to prove

character, the government may rebut that evidence through cross-examination of defense

witnesses about specific instances of conduct and through testimony of character witnesses.  *Id*.

If Defendants put forth evidence of good conduct, the government intends to rebut such

evidence through all means permissible under the Federal Rules of Evidence.

### D.    THE COURT SHOULD PRECLUDE AN ADVICE OF COUNSEL DEFENSE.

This Court should preclude an advice of counsel defense for two reasons.  First,

Defendants have refused to provide notice of their intent to rely on such a defense, which is a

waiver of the right to present it because of the prejudice inherent in preventing the government

from taking steps to examine the communications that allegedly support that defense.  Second,

there is no evidence that the Defendants can satisfy either of the two elements of the defense.

The United States has repeatedly asked defense counsel to indicate whether the

Defendants will raise an advice-of-counsel defense.  To date, defense counsel for Spivak and

Smirnova have refused to respond to the government's requests.[3]  Having refused to give notice of their intent to rely on such a defense—which would have triggered a waiver of the attorney-client privilege on the subject matter[4] and the consequent discovery of the communications that form the basis for the defense—the Court should find that Defendants' failure to provide notice is a waiver of the right to assert the defense at trial.  *United States v. Crowder*, 325 F. Supp.3d 131, 139 (D.D.C. 2018) (ordering the defendants to provide two weeks before trial notice of their intent to rely on an advice of counsel defense and disclose to the government all materials relevant to assertion of that defense or else risk that the defense will be barred at trial).  By refusing to provide notice or otherwise indicate their waiver of the relevant communications, the defendants prevented the government from discovering and examining the facts/communications that underlie such a defense.

The defendants' failure to provide notice is deliberate.  At the same time that Defendant Spivak asserts that the government's alleged review of privileged communications between Spivak and his counsel should result in dismissal of the Indictment (R. 381), he may also be attempting to maintain the contradictory position that the same communications satisfy an advice of counsel defense—a position that would necessarily result in waiver of the privilege covering those same communications.  If Spivak had answered the government's request for notice of an

---

[3] Counsel for Defendant Scott indicated that he did not plan to raise an advice of counsel defense.

[4]  *See generally United States v. Bachynsky*, No. 04-20250-CR-TORRES, 2007 WL 1521499, at *2 (S.D. Fla. May 22, 2007); *Cox v. Adm'r United States Steel*, 17 F.3d 1386, 1417–21 (11th Cir.1994) ("[c]ourts have found waiver by implication ... when a client asserts reliance on an attorney's advice as an element of a claim or defense'") (citation omitted); *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed.Cir.2005) ("The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter).

advice of counsel defense and indicated that he intended to rely on such a defense, he would have undercut the entire basis for his motion to dismiss because the government would then have a right to review those same communications—in that situation there could be no violation of a privilege that no longer exists.  This Court should not permit Spivak or any defendant to wield privilege as both a sword (in the form of a motion to dismiss for violation of the privilege) and a shield (in the form of a defense that would require the defense to waive the same privilege).

Even if Defendants had provided notice, the Court should ultimately preclude the defense.  A defendant may raise an affirmative defense that he relied on the advice of an attorney, but that defense applies only when the defendant establishes "(1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice."  *See United States v. Bruner*, 616 F. App'x 841, 846 (6th Cir. 2015) (quoting *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994)).  Defendants have provided no reciprocal discovery that satisfies the elements of such a defense.  The government therefore asks the Court to preclude such a defense and, alternatively if the Court excuses the lack of notice and permits the defendants to raise it, refuse to instruct the jury on it because the Defendants have no evidence that satisfies both prongs of the defense.

E.     THE COURT SHOULD PRECLUDE ARGUMENT THAT DEFENDANTS' CONDUCT WAS ACCEPTED WITHIN THE SECURITIES INDUSTRY.

The government believes that the Defendants may try to suggest that their conduct and promotional activity was common in the securities industry, particularly vis-à-vis microcap or penny stocks.  The Court should preclude these types of defenses.

Courts have long held that evidence that a practice is customary or widespread, or even a universal industry practice, does not excuse criminal conduct.  *See Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc*., 135 F.3d 266, 274 (3d Cir. 1998) (en banc) ("Even a universal

industry practice may still be fraudulent."); *United States v. Riley*, 550 F.2d 233, 236 (5th Cir.

1977) ("general practice is not an absolute defense to criminality. . ."); *United States v.*

*Brookshire*, 514 F.2d 786, 788-89 (10th Cir. 1975) ("[C]ustom and usage involving criminality

do not defeat a prosecution for violation of a federal criminal statute."); *Burnett v. United States*,

222 F.2d 426, 427 (6th Cir. 1955) (per curiam) ("No custom is a justifiable defense for violation

of the criminal code of the United States."); *Smith v. United States*, 188 F.2d 969, 970 (9th Cir.

1951) ("Custom, involving criminality, cannot justify a criminal act."); *United States v. Mahaffy*,

Case No. 05–CR–613, 2007 WL 1213738, at *3 n.5 (E.D.N.Y. Apr. 24, 2007) (noting that

evidence in a criminal trial relating to industry practice "is entirely irrelevant and improper"

because "[i]ndustry practice is not a defense to fraud"); *United States v. Berg*, 710 F. Supp. 438,

445 (E.D.N.Y. 1989) (limiting testimony concerning the "custom of other arms dealers in

complying with arms export laws" on the ground that such evidence was irrelevant to the state of

mind of the defendants), *aff'd in part*, *rev'd in part on other grounds sub nom*. *United States v.*

*Schwartz*, 924 F.2d 410 (2d Cir. 1991); *United States v. Slapo*, 285 F. Supp. 513, 513-14

(S.D.N.Y. 1968 ) ("[W]e have not yet reached the point, at least in this court's view, where an

industry custom and practice serves to repeal criminal laws."); *United States v. Troutman*,

814 F.2d 1428 (10th Cir. 1987) (rejecting that payoffs were just how "business was done" could

serve as a defense); *United States v. O'Grady*, 742 F.2d 682, 700 (2d Cir. 1984) ("That such

corruption may be widespread . . . is no more an excuse barring prosecution under the Hobbs Act

than . . . the 'custom' followed for many years by American companies of giving money to

officials of foreign governments with whom they did business."); *United States v. Walsh*,

700 F.2d 846, 854 (2d Cir. 1983) (holding attempts to secure fair treatment were still bribes, and

illegal under the Hobbs Act); *United States v. Fawell*, Case No. 02CR310, 2003 WL 21544239,

*8 (N.D. Ill. July 9, 2003) ("Whether the practice was common or uncommon, it was improper and the charged activities were unlawful . . . the argument and evidence that 'everybody does it'. . . [is] no more relevant here than it would be in a drug distribution prosecution.").

Indeed, numerous Circuits have held that evidence and argument based on industry custom or common practice amounts to nothing more than an "everybody does it" defense, which is irrelevant and inadmissible.   For example, in *United States v. Oldbear*, 568 F.3d 814 (10th Cir. 2009), the defendant, who had been indicted for embezzling federal tribal funds, sought to call several witnesses who "would have testified that they, like Oldbear, were allowed to use tribal funds to pay for personal transportation expenses."  *Id*. at 821.  The district court characterized the proffered testimony as attempting to establish an "everybody-is-doing-it" defense and precluded the testimony as irrelevant.   *Id*.   The Tenth Circuit affirmed, holding that "only Oldbear's actions and state of mind were material to her guilt." *Id*; *see also United States v. Pitt-Des Moines, Inc*., 168 F.3d 976, 991 (7th Cir. 1999) (concluding district court correctly excluded evidence of industry custom and practice "based on a fear that the jury might find [the defendant] not guilty because 'everyone does it'"); *United States v. Fowler*, 932 F.2d 306, 315-16 (4th Cir. 1991) (affirming district court's exclusion of testimony supporting the "everybody-does-it defense" as irrelevant (internal quotation marks omitted)); *cf. United States v. Warner*, 396 F. Supp. 2d 924, 937-38 (N.D. Ill. 2005) (deferring judgment on the issue until trial to determine relevance but noting that "any attempt to establish [the defendants'] innocence based on the fact that other administrations acted in the same manner would be improper—arguably akin to a driver pulled over for speeding who, unaware of the lawful limit, concludes that 80 m.p.h. is acceptable because she observed other drivers passing her.").

Even were the Court to find that evidence that the way Defendants promoted and sold USLG stock was a common practice in the securities industry, and thus had some probative value, that value would be substantially outweighed by the risk of jury confusion and waste of time that would necessarily follow from its introduction.  *See* Fed. R. of Evid. 403; *see also United States v. Brooks*, 681 F.3d 678, 709 (5th Cir. 2012) (affirming district court's exclusion of defendant's proffered industry practice evidence that "other energy companies were also submitting similarly false data" because evidence that fraudulent practices may be common in a particular industry "pose[s] a threat of confusing the jury and detracting from relevant information about the conduct of the actual parties"); *Oldbear*, 568 F.3d at 821 (finding exclusion of customary practice evidence proper under Rule 403 because it was likely to create a "sideshow from which the jury could have gleaned little valuable information").

Likewise, any attempt by the Defendants in this case to excuse their behavior with industry practice would be irrelevant.  The Court should prohibit the Defendants from raising these types of arguments at trial.

F.     <u>THE COURT SHOULD PRECLUDE DEFENDANTS FROM PLACING THE INVESTIGATION ON TRIAL.</u>

The government also anticipates that Defendants may attempt to question why the government failed to take certain investigative steps, such as reviewing various pieces of evidence or interviewing, identifying, and/or charging additional coconspirators in the securities fraud scheme.  Defense counsel should not be permitted to put the investigation on trial because such a strategy is legally irrelevant.

The Sixth Circuit affirmed a trial court's exclusion of evidence that the government's agents made mistakes during their investigation, including miscalculations about the number of bogus prescriptions involved in the case.  *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994).

The defense argued that they wanted to show that the investigation was "sloppy."  *Id.*  The district court reasoned that such evidence was irrelevant, "not[ing] that the jury would not be called upon to determine whether the government's investigation had been good or bad."  *Id.*  The Sixth Circuit affirmed.  *Id.*  And the Court reaffirmed the continuing vitality of this holding when it upheld a conviction despite a claim from the defendant that he should have been permitted to admit evidence on the "quality and accuracy of the Government's investigation." *United States v. Coffman*, 574 F. App'x 541, 555 (6th Cir. 2014).  Citing *Veal*, the Court of Appeals held that "a trial court does not abuse its discretion in excluding as irrelevant accusations that the Government's investigation was not perfect."  *Id.*

The Tenth Circuit followed *Veal* in affirming the exclusion of questioning and evidence designed to attack the investigation of Timothy McVeigh.  *United States v. McVeigh*, 153 F.3d 1168 (10th Cir. 1998).  McVeigh wanted to introduce evidence that there were alternate perpetrators possibly responsible for the conspiracy to destroy the Murrah building and that the government suspended its independent investigation after McVeigh's arrest and focused only on him as a suspect, which resulted in a "shoddy and slanted" investigation.  *Id.* at 1190.

The Tenth Circuit noted that it may be proper to question the sloppy nature of the government's investigation when it affects evidence in the case, for example when the poor nature of the investigation tainted the chain of custody of evidence offered at trial.  *Id.* at 1192 (citation omitted).   But when the defense attempts to question the investigation in a manner divorced from the reliability of evidence at trial procured through the investigation, that strategy improperly "divert[s] the jury's attention from the issues of the trial."  *Id.* (citation omitted).  The Tenth Circuit determined that putting the investigation on trial was irrelevant:

> Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty.  The jury is not asked to render

judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation.  The district court did not abuse its discretion, but rather is to be commended, in keeping the focus of the trial upon the issue properly before the jury.

*McVeigh*, 153 F.3d at 1192.

The government anticipates that Defendants may suggest that the government's investigation is tainted because the FBI failed to take (whether timely or not at all) certain investigative measures.  But the government's investigation and the timing thereof is irrelevant to the ultimate question at issue in trial—whether there is sufficient evidence of the Defendants' guilt, not whether there is sufficient evidence that the investigation proceeded in the way that the defense would have preferred.

If the Court nevertheless allows the defense to question the conduct of the investigation, the Court should allow the United States to defend its investigation, including with evidence that would otherwise normally be considered inadmissible hearsay.  Such evidence will be admissible in this scenario because it will be offered not for the truth of the matter, but instead to explain *why* the agents did what they are being attacked for doing:

> Hearsay is defined as an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  The record reveals that the challenged testimony was elicited in an effort to explain the basis for the FBI's decision to pursue the investigation of the defendant, and not to prove the truth of the matter asserted – i.e., that Khalil was actually engaged in narcotics trafficking in 1997 and 1998.  If properly admitted for this purpose, Agent Moran's testimony was not hearsay.  *See United States v. Pulley*, 922 F.2d 1283, 1288 (6th Cir.), *cert. denied*, 502 U.S. 815, 116 L. Ed. 2d 42, 112 S. Ct. 67 (1991) ("[out-of-court statement made to investigating agent] was offered to prove that [the agent] had good reason to continue his search of the house, it was not hearsay.").  Although this testimony is still subject to exclusion if its unfair prejudicial effect outweighs its probative value, Fed. R. Evid. 403, we conclude that the defendant "opened the door" to such testimony by placing Agent Moran's state of mind directly at issue.  *See Pulley*, 922 F.2d at 1288 (holding that out-of-court statements were properly admitted to show customs agent's state of mind where defendant suggested that agent planted drugs during a search); *see also United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) ("When one party has 'opened

the door' on an issue, by eliciting prejudicial or inadmissible testimony, an opponent, in the court's discretion, [may] introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." (internal quotation marks and citations omitted)).  By suggesting that the government improperly targeted him due to his position in the Avengers and then ultimately entrapped him when it could not uncover legitimate evidence, the defendant invited rebuttal testimony from the government to explain why it proceeded with the investigation in the manner that it did. Agent Moran's testimony was therefore properly admitted as relevant nonhearsay testimony.

*United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002).

G.   THE COURT SHOULD PRECLUDE ANY ARGUMENT REGARDING SELECTIVE PROSECUTION OF THE DEFENDANTS.

Defendants may also argue that they were unfairly selected for prosecution, or that they should be acquitted because the United States declined to charge every individual involved in the criminal activity.  These types of arguments are irrelevant, and the Court should prohibit the Defendants from raising them.  At trial, criminal defendants are not permitted to argue that they have been unfairly selected or targeted for prosecution.  *United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution").  A selective prosecution defense must be raised and litigated by way of a pretrial motion to dismiss, and not argument before the jury.  *United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995).  For that reason, courts regularly prohibit defendants from arguing at trial that they were unfairly selected for prosecution.  *See, e.g., United States v. Abboud*, 438 F.3d 554, 579-80 (6th Cir. 2006) (district court correctly precluded defendants from arguing at trial that "they were targeted because of their Arab descent in the post-September 11 landscape"); *United States v. Simpson*, 226 F. App'x 556, 562-63 (6th Cir. 2007) (district court correctly precluded defendant from arguing at trial that the government initiated prosecution because defendant had previously filed a civil rights lawsuit against the AUSA's father).

Therefore, the Court should prohibit the Defendants in this case from presenting any argument or evidence that they were unfairly selected for prosecution.

Relatedly, the Defendants should also be prohibited from arguing that they ought to be acquitted because the United States declined to charge every individual involved in the charged or similar crimes.  Why the United States chose to charge these Defendants, and not others, is irrelevant to the determination of guilt or innocence at trial.  *See Simpson*, 226 F. App'x at 562-63.  This type of argument would be completely irrelevant under Federal Rule of Evidence 401 and would serve only to distract the jury from the relevant evidence in the case.  Thus, because arguments about selective prosecution and why only certain individuals were charged are irrelevant, the Court should prohibit the Defendants from raising these arguments at trial.

H.     <u>THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE PUNISHMENT OR COLLATERAL CONSEQUENCES OF A CONVICTION.</u>

If convicted in this case, Defendants face a possible term of imprisonment, a fine, and restitution.  Defendants may endeavor to educate the jury on the potential ramifications of a guilty verdict in this case with the hope of obtaining jury nullification.  The Sixth Circuit has firmly rejected such a strategy: "[U]nless juries have roles in sentencing, such as in capital sentencing proceedings, juries should be instructed not to consider defendants' possible sentences during deliberation."  *United States v. Chesney*, 86 F.3d 564, 574 (6th Cir. 1996); *see also United States v. Stotts*, 176 F.3d 880, 886 (6th Cir. 1999) ("the Supreme Court has held that juries should be instructed not to consider a defendant's possible sentence unless the jury has a specific role in sentencing").  The Supreme Court explained the reasoning behind insulating the jury from possible penalties in a case.

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to

59

> decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States*, 512 U.S. 573, 579 (1994).  Accordingly, Defendants should not be permitted to distract and confuse the jury by inviting the jury to decide the issue of guilt with the knowledge of this Court's sentencing options or the applicable guidelines range.

Defendants often infuse sentencing into the trial under the guise of cross-examining a cooperating witness.  For example, a defendant may ask the witness about the maximum penalty for the charged offense, may compare a cooperator's plea agreement to the defendant's status, or use the cooperator to contrast a defendant's perceived situation, i.e., "You pleaded guilty because you didn't want a trial to bankrupt you, cause family strain, etc."

The government requests that this Court prohibit Defendants from eliciting any testimony or making any argument that may directly or indirectly inform the jury of sentencing options or endeavor to engender sympathy for the Defendants.  In so moving, the Government is not seeking to prohibit Defendants from questioning cooperating witnesses about potential bias from their plea agreements.  However, the Government is asking the Court to direct counsel to conduct such examination so as to truly question about bias and not merely inform the jury of the potential sentences the Defendants face.

## VII.  DEFENDANTS SPIVAK AND SMIRNOVA ARE NOT ENTITLED TO A JURY INSTRUCTION ON ENTRAPMENT.

Based on Defendant Spivak and Smirnova's pre-trial filings, proposed jury instructions, and representations to the Court and counsel, the United States anticipates that they intend to raise a defense of entrapment to the conspiracy charged in Count 2 of the Second Superseding

Indictment (and the related substantive offenses).  To establish entrapment, a defendant must prove two elements.  First, "government inducement of the crime," and second, "lack of predisposition on the part of the defendant to engage in the criminal activity."  *United States v. Khalil*, 279 F.3d 358, 364 (6ᵗʰ Cir. 2002).  "[T]he defendant must come forward with evidence to support both elements of the defense."  *Id*.  A defendant is only entitled to an entrapment instruction when "there is sufficient evidence from which a reasonable jury could find entrapment."  *Mathews v. United States*, 485 U.S. 58, 62 (1988).   When the evidence "clearly and unequivocally establishes that the defendant was predisposed" to commit the crime, the district court "is justified in denying an entrapment instruction."  *Khalil*, 279 F.3d at 365.   The Sixth Circuit has repeatedly affirmed district courts that deny an entrapment defense when a defendant failed to prove one of the two required elements.  *United States v. Schuttplez*, 467 F. App'x 349, 353-54 (6th Cir. 2013); *United States v. Demmler*, 655 F.3d 451, 456-58 (6th Cir. 2011); *United States v. Poulsen*, 655 F.3d 492, 501-03 (6th Cir. 2011); *United States v. Dixon*, 396 F. App'x 183, 185-86 (6th Cir. 2010); *United States v. Summers*, 238 F. App'x 74, 75-77 (6th Cir. 2007).  Because neither Defendant can present adequate evidence to support either element of the entrapment defense, they should be precluded from raising it.

A .   <u>DEFENDANTS SPIVAK AND SMIRNOVA CANNOT SHOW THAT THE GOVERNMENT INDUCED THEM TO COMMIT SECURITIES FRAUD.</u>

Neither Spivak nor Smirnova can establish the first element of an entrapment defense: inducement.  Inducement does not mean merely an opportunity to commit the crime.  That is because law enforcement agencies are entitled to use sting operations by which they give defendants the opportunity to commit crime.  *Poulsen*, 655 F.3d at 502; *Sherman v. United States*, 356 U.S. 369 (1958); *see also United States v. Diaz-Maldonado*, 727 F.3d 130, 139 (1st

Cir. 2013) (differentiating between government inducement and "improper" government inducement).

Establishing inducement requires more.  A defendant must show an opportunity "plus something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type motive." *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010).   For example, in *Jacobson*, the defendant was "the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations" offering child pornography.  *Jacobson v. United States*, 503 U.S. 540, 550 (1992).   And in *Sherman*, the defendant refused to engage in the criminal conduct, then was evasive, and then hesitant, prompting a series of meetings intended to overcome these feelings before the government's informant "achieve[d] capitulation."  *Sherman*, 356 U.S. at 373.

If there is insufficient evidence of inducement—one of the two essential elements of entrapment—the district court need not instruct the jury on entrapment.  The Sixth Circuit has repeatedly affirmed district courts' decisions not to submit an entrapment defense to the jury under those circumstances.   For instance, in *Loukas*, a defendant was convicted at trial for drug trafficking based on two sales of heroin to a confidential informant.  *United States v. Loukas*, 909 F.2d 1485 (6th Cir. 1990).   The defendant presented evidence that the confidential informant was a long-time friend of the defendant; that the confidential informant told the defendant he was "hard up" for money; and that the defendant made up fictional drug traffickers during the transactions.  *Id.*  The Sixth Circuit held that "those facts plainly do not make out a jury submissible question of inducement."  *Id.*

Here, Spivak and Smirnova cannot plausibly argue that the UCEs induced them to commit securities fraud.  The evidence presented during the government's case-in-chief at trial will establish that, in September 2020, the Federal Bureau of Investigation ("FBI") opened an investigation into U.S. Lighting Group, Inc. ("USLG"), Spivak, Smirnova, and others after receiving victim complaints, source reporting, and a referral from the Securities Exchange Commission ("SEC").  The FBI commenced an undercover operation, during which several Undercover Employees ("UCEs") portrayed wealthy investors interested in acquiring free-trading shares of USLG.  The FBI recorded each encounter with a UCE, Spivak, Smirnova, and/or their co-conspirators.

During initial meetings, Spivak pitched the UCEs on the scheme.  Spivak first met with the UCEs on January 20, 2021, after engaging with the government's confidential source ("CHS").  At that meeting, the UCE asked if Spivak knew of any shareholders that "might be interested in selling" their shares.  After telling the UCE that USLG had restricted stock priced at $0.15 per share that could not be sold for a year, Spivak brought up two unnamed shareholders, later identified as co-Defendant Charles Scott ("Scott") and co-conspirator Forrest Church ("Church"), who each held three million shares.  Two months later, on March 15, 2021, Spivak and Smirnova disclosed that these "very trusted guys . . . have about 3 million shares a piece." Without prompting, Spivak explained, "the plan is once a stock takes off, they're gonna sell it off and buy more off the company."  Spivak further explained that "[i]t's technically company stock . . . [b]ut if the company owns it, it's no longer free trade."  Tellingly, these shareholders—Scott and Church—are the same two individuals with whom Spivak and Smirnova previously conspired in 2016 through 2019 to conceal Spivak's beneficial ownership in free-trading USLG

stock, sell artificially inflated USLG stock to the unsuspecting public, and kick back proceeds from the sale of that stock to Spivak and USLG.

The collective recordings that follow these initial meetings similarly confirm that Spivak, Smirnova, and others pitched a scheme to the UCEs—not the other way around.  Spivak and Smirnova told the UCEs and their associates to purchase free-trading shares of USLG from nominees, sell the shares, and use the money to purchase more shares from USLG in an attempt to raise USLG's share price and trading volume—just like Spivak and Smirnova did between 2016 and 2019.  The undercover recordings demonstrate that the UCEs did not pressure Spivak and Smirnova into perpetrating this scheme.  To the contrary, it was Spivak and Smirnova who steered this scheme, soliciting UCE-1 and the CHS to purchase stock from Spivak and USLG to sell for Spivak and USLG's benefit.

For example, on February 15, 2021, Spivak, Smirnova, UCE-1 and CHS had a consensually recorded in-person meeting.  During the meeting, Spivak solicited UCE-1 and CHS to purchase stock directly from Spivak and USLG for $0.50 per share, sell the shares for $1.00 per share, and use the money to purchase more shares at $0.50 from USLG.  Spivak instructed: "[W]hat you are supposed to do, is sell it, buy more stock and we keep going in a circle like that."  Spivak added: "[T]hat's how we make a bunch of money."  The next day, Spivak, Smirnova and CHS had a consensually recorded in-person meeting.  During that meeting, Spivak solicited CHS to purchase the purportedly last outstanding convertible note from USLG so that Spivak could issue a press release stating all the notes had been converted.  Later, during a consensually recorded phone call with CHS, Spivak instructed CHS to tell UCE-2 to help raise the share price up to $3.00 per share or Spivak would reverse split the stock.  And still later, during a consensually recorded meeting among Spivak, Smirnova, and

CHS, it was Smirnova who ultimately came up with the idea to use a consulting agreement to conceal the issuance of free-trading USLG shares to CHS.

These and other recorded conversations demonstrate that Spivak and Smirnova were the drivers behind the securities fraud schemes charged in Count 2 of the Second Superseding Indictment and related substantive counts.  At no time did the UCEs direct Spivak or Smirnova's actions.  At no time did the UCEs threaten, coerce, or pressure Spivak or Smirnova to engage in their illegal conduct.  And at no time did Spivak or Smirnova express reluctance, hesitancy, or uncertainty about the securities fraud schemes.  The plain language and context of the recorded communications unequivocally establish that the government did not induce Spivak or Smirnova to commit securities fraud.  Indeed, because all of Spivak and Smirnova's interactions with the government were recorded, the Court can determine (either before trial or following the close of the government's evidence on Count 2), that Defendants have not established their prima facie burden regarding inducement.  As such, because Spivak and Smirnova cannot meet first element of an entrapment defense, the Court should preclude it.

B.    <u>DEFENDANTS SPIVAK AND SMIRNOVA CANNOT SHOW THAT THEY LACKED PREDISPOSITION TO COMMIT SECURITIES FRAUD.</u>

The Court should preclude Spivak and Smirnova from presenting an entrapment defense for a second, independent reason: they cannot show they were not predisposed.  The second element of entrapment requires a defendant to lack predisposition to commit the crime. A "predisposed defendant is one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense." *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990).  The factors a court considers include: (1) the defendant's character or reputation, including any prior criminal record; (2) whether the government initially suggested the criminal

activity; (3) whether the defendant engaged in criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only be repeated government inducements or persuasion; and (5) the nature of the inducement or persuasion supplied by the Government.  *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010).

These factors collectively establish that Spivak and Smirnova were predisposed to commit securities fraud before the government's investigation.  First, the government's investigation—which began in 2020—revealed that Spivak and Smirnova participated in a virtually identical scheme in connection with the sale of USLG stock.  In that scheme, from 2016 through 2019, they concealed Spivak's beneficial ownership in free-trading USLG shares with the help of *the same nominee shareholders* (Scott and Church) at issue in Count 2.  Spivak and Smirnova also regularly referenced their past experience with market manipulation schemes.  Indeed, in a recorded meeting among Spivak, Smirnova, and CHS as early as February 16, 2021, Spivak described his previous partner as a "professional pump and dumper." Clearly, these statements reference illegal activity that occurred years before the government's initial encounter with Spivak and Smirnova and well before the government had any opportunity to "entrap" them.

Moreover, as the Defendants' own words demonstrate, Spivak and Smirnova's 2021 plans to commit securities fraud predated and existed independently of any government involvement.  As Spivak explained in a recorded conversation with CHS on March 16, 2021:

> Spivak:        So there, there's where we're at. And also, just so you understand, Charlie [Scott] and Forrest [Church], both, for lack of better term, are more or less holding onto the stock for me.
>
> CHS:          Okay.
>
> Spivak:        And nobody was doing--for the company, I should say. **No, they, the plan was, until you guys [CHS and UCEs] came along, it is to not do**

**anything at all. Don't promote the stock, advertise the stock, talk about the stock, forget about the stock until the audits are done and posted.**

CHS:        Okay.

Spivak:      Which is gonna be sometime next week. And then after that they were going to do what you're going to do.

CHS:        Okay.

Spivak:      Make sense? Now with that being said, the more people in the party, the better off the better, the better off all we are.

Additionally, Spivak and Smirnova never hesitated to sell USLG securities to the CHS and UCEs or, tellingly, accept proceeds from those sales.  Indeed, the recorded conversations are rife with Spivak and Smirnova's references to maximizing profit and obtaining money by selling free-trading USLG shares, which they admittedly knew they could not sell without the use of nominee shareholders such as Scott and Church.  Spivak and Smirnova's substantial opportunity and desire to profit from the scheme likewise demonstrates their predisposition.

In sum, the totality of circumstances—which are captured on the government's recordings—establishes that Spivak and Smirnova were predisposed to commit securities fraud, and the government did not entrap an otherwise "innocent person." *Nelson*, 922 F.2d at 317.  For that separate, independent reason, the Court should preclude Spivak and Smirnova from raising an entrapment defense.

     C.     <u>IF SPIVAK OR SMIRNOVA RAISE ENTRAPMENT TO THE JURY, OR IF THE COURT PERMITS AN ENTRAPMENT DEFENSE, THE GOVERNMENT MAY INTRODUCE EVIDENCE OF SPIVAK AND SMIRNOVA'S CHARACTER.</u>

If Spivak or Smirnova argue entrapment to the jury before the close of the government's case-in-chief on Count 2, either during opening statement or through cross-examination of witnesses, or if the Court permits Spivak and Smirnova to raise an entrapment

defense at trial, the government seeks to admit evidence of their character in its case-in-chief.

Generally, character evidence is not admissible against a criminal defendant.  *See* Fed. R. Evid.

404(b).  However, "[w]hen entrapment is raised as a defense, the criminal defendant makes his

own character an essential trial issue.  The government may therefore introduce proof of his

prior wrongs." [5]  *United States v. Roper*, 135 F.3d 430, 434 (6th Cir. 1998); Fed. R. Evid.

404(a).  In such situations, the government is permitted to introduce not only opinion evidence

of the defendant's character, but also evidence of "specific instances" of the defendant's

conduct.  *United States v. Franco*, 484 F.3d 347, 352 (6th Cir. 2007); Fed. R. Evid. 405(b).

Here, if Spivak and Smirnova are permitted to raise entrapment to the jury, or otherwise argue

the issue to the jury, the Court should find that they opened the door for the government to

introduce in its case-in-chief character evidence to rebut such a defense.

## VIII.  ADDITIONAL EVIDENTIARY CONSIDERATIONS

### A.  GOVERNMENT WITNESS TESTIFYING PURSUANT TO PLEA AGREEMENT

The government is entitled to elicit from witnesses who have plead guilty the contents of

their plea agreements for the purpose of allowing the jury to assess credibility.  The government

acknowledges that a plea agreement is not substantive evidence of guilt and that a limiting

instruction concerning the use of such testimony would be appropriate, if requested by the

Defendants.

The Sixth Circuit has held that the government may elicit the contents of a plea

agreement from a witness on direct examination in anticipation of potential cross-examination

---

[5] Character evidence that is used to address an entrapment defense is admissible under Federal Rule of Evidence 404(a), and therefore is not subject to the same pre-trial notice requirements as Rule 404(b) evidence.  *United States v. Franco*, 484 F.3d 347, 351-53 (6th Cir. 2007).

and to afford the jury a better opportunity to evaluate the witness's credibility.  *See United States v. Townsend*, 796 F.2d 158, 162-63 (6th Cir. 1986); *United States v. Walker*, 871 F.2d 1298, 1303 (6th Cir. 1989).  Such testimony is permissible so long as it is not offered as substantive evidence of the defendant's guilt.  *Townsend*, 796 F.2d at 162; *Walker*, 871 F.2d at 1303.  The government intends to elicit testimony from some or all testifying coconspirators regarding each individual's understandings of his own plea agreement on direct examination.

      B.     <u>SUMMARY EVIDENCE</u>

The United States has obtained voluminous bank and financial records pertaining to this case.  To present relevant evidence contained within these voluminous records in an effective and efficient manner, law enforcement agents prepared summary charts to which they will testify during the government's case-in-chief.  These summary charts are admissible evidence under Federal Rule of Evidence 1006, and the United States will seek to admit them as substantive evidence, which the jury could reference during deliberations.  Federal Rule of Evidence 1006 permits the use of summary charts by providing that "contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  The Sixth Circuit has approved the use of summary materials.  *See United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998).

The summary charts will accurately depict the evidence to be presented to the jury and will streamline the trial considerably by condensing the records.  For each summary chart that the United States anticipates using at trial, the United States has complied with Rule 1006 by providing the underlying documents to Defendants and/or making the underlying documents available for examination and copying through discovery.  Additionally, the United States has produced and/or will produce all such summaries to Defendants in advance of trial pursuant to

this Court's Trial Order.  The United States would propose including the Sixth Circuit Pattern Jury Instruction Section 7.12.

## IX.    TRIAL ADMINISTRATION

### A.    THE SECOND SUPERSEDING INDICTMENT SHOULD BE SUBMITTED TO THE JURY.

The United States respectfully asks the Court to submit the Second Superseding Indictment to the jury prior to deliberation.  Given the numerous overt acts and acts in furtherance set forth in the conspiracy charges, reference to the Superseding Indictment would serve as a useful roadmap to the jury during their deliberations.  The Sixth Circuit has held that the trial judge has the discretion to submit the indictment to the jury in a criminal case so long as limiting instructions are given to the effect that the indictment is not to be considered as evidence of the guilt of the accused.  *United States v. Cooper*, 577 F.2d 1079, 1089 (6th Cir. 1978) ("It was not error for the trial judge to have permitted the jury to have a written copy of the indictment, especially where, as here, the jury was fully instructed that it could not consider the indictment as evidence of the crime itself."); *accord United States v. Russo*, 480 F.2d 1228, 1244 (6th Cir. 1973) ("The court did not commit error in permitting the jury to have the indictment during its deliberation since an instruction was given that the indictment is not evidence of guilt and only contains a statement of the charges.").

The Sixth Circuit Committee on Pattern Jury Instructions specifically addressed the issue of submitting the indictment to the jury, either by reading it to the jury or by providing a copy to the jury during their deliberations:

> Reading the indictment to the jury is generally within the discretion of the district court.  *United States v. Smith*, 419 F.3d 521, 530 (6th Cir. 2005), citing *United States v. Maselli*, 534 F.2d 1197, 1202 (6th Cir. 1976).  Instructions stating that "the purpose of an indictment is only to cause the person named therein to be brought to trial and to advise him of the nature of the charge or charges against him" have been characterized as "desirable" and "customary."  *United States v.*

70

*Baker*, 418 F.2d 851, 853 (6th Cir. 1969). Earlier versions of this commentary did not recommend that the trial judge read the indictment to the jury, and also recommended that the trial judge not paraphrase the indictment.  The Committee recognizes that district court practices on  reading or summarizing the indictment vary widely, and takes no position on the best practice.  **However, jury confusion can arise, particularly in complex cases, if the indictment is not read, accurately summarized or sent to the jury room**.  *See, e.g., United States v. Bustamante*, 1992 WL 126630, 1992 U.S. App LEXIS 13407 (6th Cir. 1992) (unpublished).  As the Eighth Circuit states in Note 2 to its Model Criminal Instruction 1.01 (2003 ed.), **"Depending on the length and complexity of the indictment and the individual practices of each district judge, the indictment may be read, summarized by the court, summarized by the prosecution or not read or summarized depending on what is necessary to assist the jury in understanding the issues before it."**  If the indictment is furnished in writing to the jury, a limiting instruction such as Instruction 1.03(1) must be given.  *United States v. Smith*, 419 F.3d 521, 531 (6th Cir. 2005) (omission of limiting instruction was error but not plain error). The Committee takes no position on the practice in some districts of providing the jury with a copy of the indictment.

 Reading the indictment to prospective jurors is  not an abuse of instructions are given to the effect that the indictment is not to be considered as evidence of guilt. *United States v. Lawson*, 535 F.3d 434, 441 (6th Cir. 2008).  Such a limiting instruction is found in Instruction 1.03(1).

Committee Commentary 2.02, Sixth Circuit Pattern Jury Instruction – Criminal (2019) (emphasis added).

The government thus requests that the Court submit the Second Superseding Indictment to the jury during deliberations, or alternatively, that the Court read the relevant sections of the Second Superseding Indictment to the jury when providing them the jury instructions.  In either case, the Court should issue a limiting instruction that the Second Superseding Indictment is not evidence of the Defendants' guilt.

B.      THE COURT SHOULD PERMIT THE UNITED STATES TO HAVE TWO CASE AGENTS REMAIN IN THE COURTROOM DURING TRIAL.

The United States respectfully requests that the Court issue a witness-sequestration order pursuant to Federal Rule of Evidence 615.  The United States also moves this Court to permit two FBI case agents to remain in the courtroom during trial.  The United States designates FBI

Special Agents Anthony Fry and Catherine Broomfield, the lead case agents, as their representatives in this case to be present at counsel table throughout the trial. *See* FED. R. EVID. 615(b) (specifically excluding from a sequestration order "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); FED. R. EVID. 615(c) (providing an additional exception for essential witnesses).

Under Federal Rule of Evidence 615(c), the government may designate an additional case representative for trials that are sufficiently complex so that "the aid of more than one law enforcement officer is needed to sort through extensive, technical evidence, and to help 'map out strategy.'" *United States v. Phibbs*, 999 F.2d 1053, 1072 (6th Cir. 1993). Here, both SA Fry and SA Broomfield have served as key members of the investigative team assigned to this matter and have become conversant in the evidence. The agents will prepare, organize, and familiarize themselves with the exhibits in this case, and their presence will streamline the presentation of evidence in this matter. Accordingly, the government submits that SA Fry and SA Broomfield are essential witnesses pursuant to Rule 615(c) who both should be permitted to sit at the government's table for the duration of trial.

## X.    CONCLUSION

The United States is prepared to submit additional briefing on any issue should the Court or circumstances require.